## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| DARIAN WOODBRIGHT, ET AL., | § | |
| *on behalf of themselves and others* | § | |
| *similarly situated*, | § | |
| | § | NO:  4:24-cv-04611 |
| *Plaintiffs*, | § | Judge Ellison |
| | § | |
| v. | § | |
| | § | |
| HEALTH MATCHING | § | |
| ACCOUNT SERVICES, INC., | § | |
| | § | JURY TRIAL DEMANDED |
| *Defendant*. | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT
## HEALTH MATCHING ACCOUNT SERVICES, INC.'S
## MOTION FOR PROTECTIVE ORDER (Dkt. 22)

Plaintiffs Darian Woodbright (**Woodbright**), Melanie Furniss (**Furniss**), Bobbie Pope (**Pope**), Robert Mainini (**Mainini**), and Jacques Pierre Meuret (**Meuret**), *individually and on behalf of others similarly situated* (collectively, **Plaintiffs**) respond to Defendant Health Matching Account Services, Inc.'s ("**HMAS**") Motion for Protective Order (Dkt. 22) ("**Motion**") as follows:

## INTRODUCTION

Beginning in the fall of 2022, HMAS began implementing material changes, without return consideration, that were aimed at and had the effect of making it substantially more difficult, if not impossible, for customers to utilize their accounts, and to encourage customers to discontinued making monthly payments for a service they were not receiving, as promised or otherwise, so that HMAS could confiscate the money in their accounts. Although Plaintiffs describe a multitude of breaches in the Complaint, HMAS disingenuously mischaracterizes the Complaint by claiming that the "sole" alleged breach is HMAS' decision on October 12, 2023 to

discontinue allowing customers to pay for covered medical expenses with debit cards.  While that certainly is a breach, that is not the only breach.

Consequently, HMAS's effort to conceal its misconduct, and other relevant information and information reasonably calculated to lead to the discovery of admissible evidence, based on HMAS's mischaracterization of the issues relevant to this lawsuit, should be denied.

## BACKGROUND

1.    Since approximately 2016, HMAS has marketed and sold to consumers, both directly and through insurance brokers, "Health Matching Accounts," which have the same spending restrictions as, but none of the tax advantages of, a "Health Savings Account."  The monthly fees that HMAS charges for a Health Matching Account are also substantially higher than for a Health Savings Account, and unlike Health Savings Accounts, where accountholders can contribute regularly or irregularly, and in amounts they can afford during a particular time period, Health Matching Accounts have draconian forfeiture penalties that allow HMAS to confiscate 100% of a customer's money in their account if a customer fails to timely make a required contribution or pay a required maintenance fee.

| COMPARISON[1] Health Savings Accounts vs. HMAS'S Health Matching Account | | |
|---|---|---|
| Topic | Health Savings Account | HMAS Health Matching Account |
| Are there restrictions on what types of expenses funds can be used to pay for? | YES | YES |
| Is any portion of contributions tax deductible? | YES | NO |
| Is the accountholder required to make monthly contributions? | NO | YES[2] |
| Is the account portable? | YES | NO |
| Does interest accrue on any portion of funds in the | YES | NO |

---

[1] This is not an all-inclusive list.
[2] Customers are required to make monthly contributions, at a pre-set amount, until the cap for the account is reached.

2

| | | |
|---|---|---|
| account? | | |
| Can the account balance be forfeited for failing to timely pay an account-related fee? | NO | YES |
| Can the account balance be forfeited for failing to timely make a monthly contribution? | NO | YES |

2.      In an effort to make Health Matching Accounts appealing to consumers, given the comparisons above, among others, HMAS agreed to provide matching contributions to customer accounts and promoted the fact that consumers could easily use those funds to pay for covered expenses with a debit card.

3.      For HMAS's business model to be sustainable and/or profitable, however, HMAS needed for, among potentially other things, customers to:  (a) limit utilization of their accounts in order to keep money from customer and HMAS contributions in the accounts; and (b) breach or purportedly breach their agreements or otherwise die, quit, give up or surrender their accounts, specifically including by not timely making mandatory monthly contributions or timely paying mandatory monthly maintenance fees.

4.      As alleged in the Complaint, that business model—making matching contributions while providing convenient means to pay for covered expenses without the need to jump through hoops and hurdles—failed to generate enough customer defaults to be profitable and/or sustainable, and customers were too easily able to spend their own funds, and matching funds from HMAS, on covered expenses, with whatever medical provider they wished, utilizing the HMAS provided debit card.

5.      Consequently, as alleged in the Complaint, beginning in the fall of 2022 and continuing thereafter, HMAS began making a series of radical and unforeseeable changes aimed at making it more burdensome and difficult for customers to utilize their accounts, and increasing customer attrition (and HMAS confiscation of funds in customer accounts), specifically including

by discontinuing to provide material services and/or benefits to customers, which resulted in a "cavalcade of breaches." *See e.g.*, Complaint, Dkt. 1 ¶¶ 35-38, 43, 63. The Complaint further alleges that "HMAS breached the contracts by unilaterally changing how claims were paid, changing the rules for what claims were allowed, and not paying allowed claims in full." (*Id.* ¶ 100).

6.    The Complaint identifies *one* such change as HMAS's decision to discontinue debit cards October 12, 2023. (*Id.* ¶¶ 38-40). **Another alleged breach is that HMAS did not actually fund matching contributions as promised** ("matching was phantom and money never actually was added to client accounts as promised (this also constitutes a material breach of the Contracts)." (*Id.* ¶ 45(c)). Another is not timely paying covered expenses. (*Id.* ¶ 102). Another was changing the program to require providers to submit claims for payment to HMA. (*Id.* ¶¶ 47, 48). Another was HMAS not paying the full amount of covered claims or expenses. (*Id.* ¶¶ 52, 56). Another was deducting larger amounts from customer accounts than HMAS actually paid. (*Id.* ¶¶ 54, 55). Others include, among potentially more, debiting customer accounts despite not having paid for the associated claims (*id.* ¶ 60), implementing in-network or out-of-network type restrictions (*id.* ¶ 50), forcing providers to hunt for payment or jump through any hoops to receive payment (*id.* ¶ 49), fighting with and delaying payments to providers (*id.* ¶ 51), making partial payments with notations that acceptance of partial payment was a waiver of claimed amounts (*id.* ¶ 52), utilizing tactics that caused medical providers to seek payment directly from customers, who wanted but were unable to pay with funds from their account (*id.* ¶ 53), adding requirements for providers to submit an estimate of benefits and W-9 (*id.* ¶ 58), and adding a myriad of other HMAS invented hurdles and exclusions (*id.* ¶ 59). *See also* Dkt. 1 ¶¶ 67, 68 (BBB Complaints and Google reviews).

7.    With respect to HMAS's decision to discontinue use of the debit card, HMAS

contends that "**no provision of the Contracts obligated HMAS to use the Card as the sole method of performance** (i.e., paying claims for reimbursement of medical expenses by Primary Holders). Dkt. 10 at 6 (emphasis in original). In that regard, HMAS argues that allowing customers to pay claims with a debit card was not a material benefit of the contracts. Thus, the debit card accounts and debit card communications, benefits, usage, profitability or not, and HMAS's intentions behind its decision to discontinue debit cards—and to implement the other things alleged in the Complaint—is relevant and, at the very least, is reasonably calculated to lead to the discovery of admissible evidence.

8.      Included amount those intentions is HMAS's profitability or lack thereof, and HMAS's financial ability or inability to fund matching contributions as promised. *See* Dkt. 1 ¶ 45(c) (alleging that this also constitutes a material breach of the Contracts). Further, at the end of the day, Plaintiffs' must track down the missing matching funds and restore the benefit of their bargain. Further, when customers do successfully jump through all of HMAS's unilaterally added hoops and hurdles, HMAS still refuses to use the customer's own contributed money to pay for covered expenses, making it appear that HMAS has secreted or spent those funds.

9.      HMA over-promised and its customers suffered the consequence of the poor planning of a novel business. *See* (Cmplt. ¶¶ 67, 68). HMA was set up with the expectation that customers would not stick with the payments and HMA could take the balance without ever having to "double" the customers deposits. (Cmplt. ¶¶26, 27). Unfortunately for HMA, the customers utilized the benefits offered and kept paying each month so the funds could not be confiscated by HMA.  (Cmplt. ¶¶ 34, 35). HMA needed to remedy their "success" and slow down the system before it needed to pay the matching funds that, according to an insider, never existed. (Cmplt. ¶ 45). HMA's "solution" to its success was to completely change the claims processing system so

that HMA could deny claims with impunity, partially pay claims, and delay payment. *See* (Cmplt. ¶¶ 37, 67, 68).

10.     In late 2022, after receiving millions in deposits into customer accounts (that HMA daringly promised to double), HMA materially breached the Agreement. (Cmplt. ¶ 6). HMA purportedly "amended" the terms while still holding the customers money and without offering to refund the balance when the terms were "amended". (Cmplt. ¶ 6). Most outrageous, HMA told customers if they didn't keep paying the monthly fee, regardless of the radical changes in the account management and failure to pay claims, HMA would keep the customers' money. (Cmplt. ¶ 6).

11.     HMA's radical breaches of contract between 2022 and 2024 enabled HMA to confiscate millions of dollars in account balances, and for those customers that did not immediately quit and surrender their entire account balance to HMA, HMA received millions of dollars of additional monthly maintenance fees as ransom while holding their customers' health savings hostage. (Cmplt. 37).

12.     The Complaint alleges a vendor of HMA stated:

a.     Elliot Gorog told him via text message that Gorog hoped customers would stop paying because the claims process was now so difficult;

b.     HMA made over $20,000,000 in revenue off of confiscating customers' accounts;

c.     All matching was phantom and money never actually was added to client accounts as promised (this also constitutes a material breach of the Contracts);

d.     Claims Choice was never paid for its work on behalf of HMA and Claims Choice commenced an arbitration seeking over $500,000 owed; and

e.     Claims Choice advanced payments for HMA customers and HMA refused to reimburse over $70,000 spent directly on health care for HMA customers.

(Cmplt, Dkt. 1 at ¶ 45)

13.     The Complaint alleges the common class issues are:

a.    whether Defendant breached the terms of the contract;

b.    whether Plaintiffs and members of the class are entitled to rescission of their contracts;

c.    whether Plaintiff and members of the class are entitled to compensatory relief;

d.    whether Plaintiff and members of the class have sustained damages, and, if so, what is the proper measure of damages….

(Cmplt. ¶ 88).

14.    The Complaint alleges HMA breached the contract by "otherwise acted in bad faith as alleged herein" thus the whole swath of deplorable conduct is at issue here. (Cmplt. 104).

15.    HMA agrees the more salacious allegations of the complaint are the subject of discovery and requested the following:

**REQUEST FOR PRODUCTION NO. 25**: All documents and communications concerning the "attrition rate" of customers with HMAS *see, e.g*., Paragraph 35 of the Complaint.

**REQUEST FOR PRODUCTION NO. 26**:  All documents and communications concerning the business model of HMAS, *see, e.g*., Paragraph 36 of the Complaint.

**REQUEST FOR PRODUCTION NO. 27**: All documents and communications concerning the alleged "confiscate[ion] of millions of dollars in account balances," *see, e.g*., Paragraph 37 of the Complaint.

**REQUEST FOR PRODUCTION NO. 28**: All communications (emails, texts, letters, memos, posts, etc.) You have had with, received from and/or made to Phil Burghardt of ClaimChoice concerning HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 29**: All text messages sent to and/or received from Phil Burghardt or anyone about HMAS and/or the statements/allegations in Paragraph 45 (and subparts) of the Complaint..

**REQUEST FOR PRODUCTION NO. 30**: All text messages sent to and/or received from Regina Gorog or anyone associated with HMAS about HMAS and/or the statements/allegations in Paragraph 45 (and subparts) of the Complaint.

**REQUEST FOR PRODUCTION NO. 37**: All documents concerning any alleged stealing and skimming of dollars from Class Member accounts, *see, e.g*., Paragraph 55 of the Complaint.

**REQUEST FOR PRODUCTION NO. 39**: All documents concerning Your allegation that HMAS acted in "bad faith," *see, e.g*., Paragraph 57 of the Complaint.

(Production Request Attached hereto as Exhibit "A")

16.      On April 7, 2025, pursuant to Federal Rule of Civil Procedure 45, Plaintiffs served a subpoena duces tecum on non-party One Inc.—the former debit-card processor for HMAS— seeking documents relating to the creation, funding, administration, and termination of the Medical Reimbursement Card ("MRC") program from January 1, 2016 through March 1, 2025.1 These materials are critical to establishing, inter alia: (1) HMAS's uniform course of conduct toward class members; (2) the existence of common questions capable of class-wide resolution; (3) the scope of contractual obligations assumed by HMAS; (4) the timing and circumstances of HMAS's unilateral decision on October 12, 2023 to cancel the MRC and replace it with "direct pay;" and (5) damages and restitution flowing from that breach.

17.      One, Inc. was the administrator for HMA's debit cards and maintained records of HMA's funding of the debit cards, its contract for use of the credit cards, but does not maintain individual records of spending by customers.

18.      On April 21, 2025 rather than allow One Inc. to raise any objections of its own, HMAS moved for a protective order. The Motion asserts five grounds: (i) purported improper service; (ii) temporal overbreadth; (iii) thematic overbreadth/ irrelevance; (iv) disclosure of members' protected health information ("PHI"); and (v) disclosure of HMAS's financial information. See Mot. 3-11.

19.      On April 22, 2025, not having received notice of any Motion nor apparently any other communication from counsel for Defendant, One, Inc. who administered the cards at issue in this case, responded to the subpoena. The documents produced included: (1) Defendant's contract with the card provider, (2) Notice of termination with the card provider in August 2023; and (3) Statements from 2018 to 2022 showing amounts Defendant paid to the card provider and

payments stopping from Defendant in the summer of 2022.  The payment history and notice of breach yielded highly probative evidence of the timing of the alleged breach.

20.   On April 23, 2025, Plaintiff's counsel shared the documents produced with defendant and suggested that in light of the completion of the narrow production the instant Motion was mooted. Defendant disagreed so we proceed with the motion.

Accordingly, it appears that HMA requires the Court's instruction on some basics of relevancy so we can get to the bottom of HMA's operations and measure damages expeditiously.

## LEGAL STANDARD

A party seeking a protective order bears the burden of showing good cause with "specific facts" demonstrating the particular harm that will result from the discovery sought. *In re Terra Int'l Inc.*, 134 F.3d 302, 306 (5th Cir. 1998); FED. R. CIV. P. 26(c)(1); *U.S. v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978)(" Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that "the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements") The court must balance that alleged harm against the requesting party's need for the information, mindful that discovery under Rule 26(b) is to be "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  The party seeking such an order must show good cause and a specific need for protection.  *In re Terra Int'l*, 134 F3d 302, 306 (5th Cir 1998). The court must compare relative burdens and benefits when considering a request for protection—the hardship borne by the party complying with the discovery versus the probative value gained by the opponent obtaining the information. *Cazorla v Koch Foods of Miss. LLC*, 838 F3d 540, 555 (5th Cir. 2016).

## ARGUMENT

### I.   HMAS LACKS STANDING TO CHALLENGE SERVICE AND MAY NOT ASSERT NON-PARTY OBJECTIONS.

Only the subpoenaed non-party—or a party asserting a personal right or privilege— has standing to object to service defects. *Brown v. Braddick*, 595 F.2d 961, 967 (5th Cir. 1979).   One Inc. has not objected. One, Inc. accepted service via email and responded to the Subpoena.   HMA lacks standing to raise the issue, and in any event any defect is easily cured without court intervention.

### II.   THE SUBPOENA'S TIME FRAME IS NARROWLY TAILORED.

Plaintiffs' class definition spans the entire period during which HMAS marketed and administered the MRC program—January 2016 forward.  Documents predating the October 2023 breach are indispensable to (a) show HMAS's contractual interpretation, course of performance, and notice to class members; (b) rebut HMAS's affirmative defenses (e.g., waiver, consent, or accord); and (c) establish numerosity and typicality under Rule 23.  Courts routinely authorize pre-breach discovery where earlier conduct "could lead to other matter that could bear on" liability or damages.  *Oppenheimer,* 437 U.S. at 351; *see Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 820 (5th Cir. 2004) ("Discovery requests are relevant when they seek admissible evidence or evidence that is reasonably calculated to lead to the discovery of admissible evidence."); *Villanueva v. Wal-Mart Real Est. Bus. Tr.*, No. 5:21-CV-35, 2021 WL 11421847, at *2 (S.D. Tex. Oct. 18, 2021) (same).  In this case the damages can be measured by how much HMA took from Plaintiff's.  Obviously, records showing what money was taken, when, and the basis for it are material in a case seeking rescission.

HMAS offers no specific burden evidence; its objection therefore fails.  *See Wiwa v. Royal Dutch  Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004)  (party  must provide detailed showing of burden).

## III.    THE REQUESTED SUBJECT MATTER IS DIRECTLY RELEVANT AND PROPORTIONAL.

The single document request seeks all contracts and communications between HMAS and One Inc. and all account information associated with the card program.  Those materials go to the core merits questions and to Rule 23 prerequisites: • Commonality & Typicality – whether HMAS applied uniform terms and procedures; • Predominance – whether liability can be proved with common evidence; • Adequacy – whether Plaintiffs' interests are aligned with the class; • Damages – traceability of debit-card loads, fees, reversals, and replacement payments.

HMAS's assertion that One Inc. "was not involved" when the breach occurred is beside the point. The decision to terminate the card program cannot be understood without the underlying contractual and operational history—and Defendant's internal and external communications about that history.

Generally, the scope of discovery is broad and permits the discovery of "any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1); *see Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982). A discovery request is relevant when the request seeks admissible evidence or "is reasonably calculated to lead to the discovery of admissible evidence." *Wiwa v. Royal Dutch Petroleum Co*., 392 F.3d 812, 820 (5th Cir. 2004) (citation and internal marks omitted); *see Murphy v. Deloitte & Touche Group Ins. Plan*, 619 F.3d 1151, 1157, 1162 (10th Cir. 2010) (applying Rule 26(b)(1) discovery rules in an ERISA action).

In this case there is no rule, law, or case that Defendant can rely on to limit the discovery to only certain claims or allegations. The pleadings are what they are and Plaintiffs are entitled to discovery made relevant by the pleadings and the subject of Defendant's own discovery no less.

## IV.  CONFIDENTIAL  MEMBER  OR  FINANCIAL  INFORMATION  CAN  BE PROTECTED WITHOUT HALTING DISCOVERY

Any legitimate privacy concern is addressed by the parties' agreed protective order, which already permits designation of "Confidential" or "Attorneys' Eyes Only" material and requires redaction of personal identifiers.  Rule 45 subpoenas for customer records are routinely enforced subject to such safeguards.  *See, e.g., KeyBank Nat'l Ass'n v. Perkins Rowe Assocs., L.L.C.*, No. 09-497, 2011 WL 90108, at *3 (M.D. La. Jan. 11, 2011) (allowing production of account data with redactions).  HMAS has not articulated any statutory privilege— HIPAA or otherwise—that would be violated by producing transactional data under a protective order.  Nor has HMAS shown that redaction or coding would impose undue burden.

As to HMAS's own financial information, Rule 26(b)(1) proportionality requires analysis of the parties' relative access. Plaintiffs have no other source for the amounts HMAS paid or received under the One Inc. agreements—figures directly relevant to restitution and disgorgement even in contract cases. Defendant cannot shield that data merely by labeling it "sensitive." *See Gonzalez*, slip op. at 4-5 (rejecting protective order where privacy concerns could be mitigated by confidentiality designations).

Ultimately this is moot because no individual member information was produced by One, Inc.

## V.  HMAS  HAS  NOT  CARRIED—AND  CANNOT  CARRY—ITS  RULE 26(c) BURDEN.

To obtain a protective order HMAS must establish a "clearly defined and serious injury" that outweighs Plaintiffs' need for the information. *In re Terra Int'l*, 134 F.3d at 306. It has offered none. Instead, HMAS relies on blanket assertions of irrelevance and burden, precisely the type of objection courts in this Circuit reject. *See Wiwa*, 392 F.3d at 818. Because HMAS has

failed to make the required "particular and specific demonstration of fact," its Motion must be denied. *Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 555 (5th Cir. 2016). There is no burden on HMA. It must disclosed facts and evidence based on the claims alleged including it's bad faith conduct.

## **CONCLUSION**

For the foregoing reasons Plaintiffs respectfully request that the Court DENY Defendant's Motion for Protective Order in its entirety, order HMAS to withdraw its objections, and award Plaintiffs their reasonable expenses under Rule 37(a)(5)(B).

Respectfully submitted,

.

By:

ALEXANDER LOFTUS, Esq.
Attorney-in-Charge
SDTX Federal No. 3663102
**LOFTUS & EISENBERG, LTD.**
161 N. Clark Suite 1600
Chicago, Illinois 60601
Ph: 312.899.6625
alex@loftusandeisenberg.com
*Lead Counsel*

*- and -*

JAMES CREWSE, Esq.
Texas Bar No. 24045722
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph: 214.394.2856
jcrewse@crewselawfirm.com
*Local Counsel*
**ATTORNEYS FOR PLAINTIFFS
AND THE PROPOSED CLASSES**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that May 12, 2025, a true and correct copy of the foregoing was filed

via the Court's CM/ECF system, which will automatically serve notice on all counsel of record.

/s/ Alexander Loftus          
Alexander Loftus

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DARIAN WOODBRIGHT, ET AL., *on behalf of themselves and all others similarly situated*, | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. 4:24–CV–04611 |
| HEALTH MATCHING ACCOUNT SERVICES, INC., | § § § | Judge Ellison |
| *Defendant.* | § § | |

**DEFENDANT HEALTH MATCHING ACCOUNT SERVICES, INC.'S
<u>FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFFS</u>**

Under Federal Rule of Civil Procedure 34, Defendant Health Matching Account Services, Inc. ("HMAS") serves on Plaintiffs Darian Woodbright, Melanie Furniss, Bobbie Pope, Robert Mainini, and Jacques Pierre Meuret (collectively "Plaintiffs") its First Set of Requests for Production. HMAS demands that Plaintiffs produce documents within **thirty (30) days** after service of these requests to the offices of Kane Russell Coleman Logan, PC, 5151 San Felipe, Suite 800, Houston, TX 77056. The definitions and instructions that follow apply to each request.

Dated: April 4, 2025.

Respectfully submitted,

By: */s/ Dennis P. Duffy*
**Christopher C. Pappas**
Texas Bar No. 15454300
S.D. Tex. Fed. No. 5966
**Dennis P. Duffy**
Texas Bar No. 06168900
S.D. Tex. Fed. No. 10502
**Andrea M. Johnson**
Texas Bar No. 10679600
S.D. Tex. Fed. No. 1285
KANE RUSSELL COLEMAN LOGAN PC
5151 San Felipe, Suite 800
Houston, Texas 77056
Telephone: (713) 425-7400
Fax: (713) 425-7700
cpappas@krcl.com
dduffy@krcl.com
ajohnson@krcl.com

*Counsel for Defendant Health Matching Account Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been served in accordance with the Federal Rules of Civil Procedure on this 4th day of April, 2025, as follows:

<u>**VIA E-SERVICE**</u>
Alexander Loftus
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
alex@loftusandeisenberg.com

James Crewse
CREWSE LAW FIRM, PLLC
5919 Vanderbilt Avenue.
Dallas, Texas 75206
jcrewse@crewselawfirm.com

*/s/ Dennis P Duffy*
Dennis P. Duffy

## INSTRUCTIONS

1.     All electronically-stored information that can be converted to an image should be produced in single-page, searchable true color (24 bit) JPG images unless otherwise agreed. Counsel is willing to confer, as necessary, as to the format of production. All metadata associated with the responsive material and documents shall be maintained. All other responsive material and documents that cannot be converted to an image (such as audio or video files) should be produced as it is kept in the usual course of business in native format with all metadata preserved with any identifying labels, file names or markings, or similar identifying features left fully and completely intact. Image placeholders should be generated to indicate any native files which are produced, and we request that native files be produced and provided for any Excel or multimedia files,).

Images should be produced in a directory named "IMAGES" and match the page identifier for that specific image. A document should not be broken between image volumes. Folders produced should be limited to 1,000 files per folder. The OCR/searchable text files should be placed in a separate "TEXT" directory. OCR/searchable text should be in a multi-page format and named to match the corresponding image file of the Bates Start identifying name. No more than 1,000 text files per folder. Native documents are to be produced in a separate folder called "NATIVES." All native files should be named by corresponding Begdoc.

All metadata associated with the responsive material and documents shall be maintained. For items produced in image format, all hidden text (e.g., track changes, hidden columns, mark-ups, and notes) shall be expanded and rendered in the image file. All non-graphic embedded objects that are found within a file (e.g., Word documents, Excel spreadsheets, .wav files, etc.) shall be extracted and produced and shall be treated as attachments to the original file, with the parent-child relationship preserved. Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme shall be decrypted prior to processing for production, to the extent possible. Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the responding party should discuss the potential export formats.

An Opticon and or Ipro load file is needed to load the images with a .dat file for all metadata for electronically-stored information. Please provide the following fields in the load file:

Bates Start, Bates End, Page Count, BegAttach, EndAttach, ParentID, AttachmentID, Custodian, Filename, To, From, CC, BCC, Author, Recipient, Date Sent/time sent (combined), Date Created/time created (combined), Date Last Modified/ time last modified(combined), Date/Time Last Saved(combined), Master DateTime (Date/Time Sent (Combined) for Email entire family date or Date/Time Created (Combined) for Stand-Alone Edocs), Email Subject, Subject (non-email),

3

MD5, INTERNETMSGID, MESSAGEID, InReplyToID, & Filepath (original file path or location).

For the fielded metadata data listed above, a delimited text file or .dat file is requested with the following ASCII code delimiters:

Column (þ) - ASCII 020;

Quote () - ASCII 254;

Newline(®) - ASCII 174.

2.      In answering these Requests, Plaintiffs must furnish all requested information not subject to valid objection which is known, possessed by or available to him or any of his attorneys, representatives or other agents. If Plaintiffs are unable to respond fully to any of these Requests, each Plaintiff must respond to them to the fullest extent possible, specifying the reasons for their inability to respond to the remainder and stating whatever information, knowledge or belief he or she has concerning the unanswered portion. If Plaintiffs objects to any Requests, he or she must state the basis for the objection.

3.      When asked to produce "**all documents**" relating to a matter inquired about in these document requests, it is expected that Plaintiffs will conduct a reasonable search through their files or records believed to contain relevant information and will identify the pertinent documents located even if Plaintiffs are not willing to produce such information because of some claim or privilege, work product or for any other reason.

4.      If Plaintiffs have good faith objections to any Request, or to any part thereof, Plaintiffs shall state the specific nature of the objections and whether they apply to the whole Request or certain parts of it; if there is an objection to part or parts of a Request, identify the part or parts objected to and respond to the remaining parts.

5.      If Plaintiffs contend that they are entitled to withhold from production any documents or tangible items requested herein on the basis of attorney-client privilege, the work product doctrine or any other ground, Plaintiffs are required to supply the following information in its response as to each document:

a.      Describe the nature of the document (e.g., letter or memorandum);

b.      State to which Request(s) the document would have been responsive;

c.      State the name of each person or other entity who or which drafted, authored, authorized or prepared the document;

4

d.   State the document's title;

e.   Identify the name of each person or other entity whom the document or copy or reproduction thereof ever was directed, addressed, sent, delivered, transferred, mailed or given in any other manner disclosed;

f.   State the identity of the holder of the privilege;

g.   Identify the custodian of the document;

h.   State the subject matter of the document;

i.   State the basis upon which Plaintiffs contends they are entitled to withhold the document from production; and

j.   Identify all persons who to Plaintiffs' knowledge have seen the document.

6.   These Requests are addressed to Plaintiffs and their agents. If the requested documents are known by Plaintiffs to exist, but are not in the possession, custody or control of Plaintiffs or their agents, so state and produce documents that show the name of the person or entity in whose custody such documents reside.

7.   Any documents responsive to any Request should be identified as being responsive to the specific request involved. If the same document is responsive to more than one Request, all Requests to which it is responsive should be identified. If there are no documents in Plaintiffs' possession, custody or control that are responsive to a particular Request, so state and identify such Request.

8.   If any documents responsive to any Request have been lost, mutilated or destroyed, so state and identify each such document, the time and circumstances under which the loss, mutilation or destruction occurred, and state to which Request(s) the document would have been responsive.

## **DEFINITIONS**

All definitions and rules of construction contained in the Federal Rules of Civil Procedure are incorporated by reference into these Requests.

A.   "Plaintiffs," "You," or "Your," means Plaintiffs Darian Woodbright, Melanie Furniss, Bobbie Pope, Robert Mainini, and Jacques Pierre Meuret, including, without limitation, their agents, attorneys, accountants, employees, representatives and all persons acting or purporting to act on their behalf. The term "Plaintiff" means any one of the Plaintiffs identified above, as the context may reference.

B.      "HMAS" or "Defendant" means Health Matching Account Services, Inc., including, without limitation, its agents, attorneys, accountants, employees, representatives and all persons acting or purporting to act on its behalf.

C.      "ClaimChoice" means ClaimChoice, LLC (referred to as "Claims Choice" in the Complaint, *see* Complaint at paragraph 44-46), including, without limitation, its agents, attorneys, accountants, employees, representatives and all persons acting or purporting to act on its behalf.

D.      "Complaint" means the Class Action Complaint filed by Plaintiffs in above-captioned and styled lawsuit, and any amendments and supplements thereto.

E.      The term "Debit Cards" means the Medical Reimbursement Cards issued by HMAS to Plaintiffs.

F.      The term "health savings account" means the HMAS account You contributed to.

G.      The term "services" means the services HMAS provided to You in connection with Your HMAS health savings account.

H.      The term "contract claim" refers to Plaintiffs' breach of contract claim as asserted in the Complaint.

I.      The term "communication" refers to any transmission, exchange or transfer of information, ideas, facts, data, proposals or any other matter, whether between individuals or between or among members of a group, whether face-to-face, by telephone, by e-mail, by text message, by instant message or by means of written, electronic, magnetic, or other medium.

J.      The terms "document" or "documents" refer to all types of recorded information, written, graphical, electronic or digital, including all originals, drafts, duplicates and nonconforming copies or that contain deletions, insertions, handwritten notes or comments, however produced or reproduced, including, but not limited to: all handwritten, typed, printed and photostatic information; all agreements, understandings or contracts; all communications, correspondence, e-mails, instant messaging conversations, social media profiles, statuses, posts, tweets, and messages, letters, telegrams, telexes, telecopies, text messages or memoranda; all records, reports, books, tape recordings, electronic recordings, digital recordings, summaries or other records of telephone conversations, instant messaging conversations, text message conversations or interviews; summaries or other records of personal conversations; summaries or other records of meetings and conferences; diaries, calendars or appointment books; financial statements, worksheets, pricing lists, sheets or guidelines, cost lists, sheets or guidelines, discount lists, sheets or guidelines, accounts, ledgers, notes, bills, statements, invoices, journal entries, receipts, checks, or cancelled checks; envelopes, folders or similar containers; microfilm, microfiche, booklets, circulars or pamphlets; photographs, pictures, graphs or charts; computer programs, cards, tapes, disks, CDs, DVDs, USB drives, flash

drives, zip drives or magnetic or other memory components of computers that contain or store information; speeches, transcripts, depositions, press releases, brochures, books of account, affidavits, declarations, invoices and notes or minutes of meetings of boards of directors, audit committees, financial committees and executive committees; interoffice communications, instant messages, sms messages, text messages, social media posts or website or blog posts; results of investigations; working papers, newspaper or magazine articles; records of payments, releases, or receipts; maps, listings, tax returns, vouchers or powers of attorney; records, recordings, films, tapes or other data compilations from which information can be obtained; or any similar documents, materials or information of every kind or nature, whether in paper or electronic form.

      K.     All documents or communications that "relate to" a given subject means all documents or communications that constitute, contain, embody, comprise, reflect, identify state, refer to, deal with, comment on, respond to, describe, analyze, or are in any way pertinent to that subject including, without limitation, documents concerning the presentation of other documents.

      L.     When a document to be produced is an e-mail, please include reference to all copies of the e-mail, and any e-mails, notes, memoranda or other documents to which the e- mail was sent in response, and/or any e-mails, notes, memoranda or documents sent subsequently to the e-mail which are in response to the e-mail, or which relate to the e-mail in any way and/or any e-mails or documents forwarding the e-mail.

      M.     "Each" shall include the terms "each and every."

      N.     The term "all" shall include the terms "any and all."

## FIRST SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**:    All recordings of broker or investor meetings and/or calls, including the zoom call referenced within Paragraph 34 of the Complaint.

**REQUEST FOR PRODUCTION NO. 2**:    All documents and communications which reference, discuss, and/or evidence the damages of Plaintiffs and/or of the putative class members as alleged in the Complaint.

**REQUEST FOR PRODUCTION NO. 3**:    All documents and communications which reference, discuss, and/or evidence the claims Plaintiffs submitted to HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 4**:    All documents and communications which reference, discuss, and/or evidence the handling of claims any Plaintiff submitted to HMAS.

**REQUEST FOR PRODUCTION NO. 5**:    All documents and communications which reference, discuss, and/or evidence the handling of claims any Plaintiff submitted to ClaimChoice.

**REQUEST FOR PRODUCTION NO. 6**:    All documents and communications which reference, discuss, and/or evidence any alleged rejection, difficulty with, and/or questionable conduct concerning the claims any Plaintiff submitted to HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 7**:    All emails, correspondence, text messages, and/or other communications, if any, between any Plaintiff and/or any putative class member related to HMAS, ClaimChoice, and/or the allegations made in the Complaint.

**REQUEST FOR PRODUCTION NO. 8**:    All documents which reflect, support, and/or explain Plaintiffs' contract claim as alleged in the Complaint.

**REQUEST FOR PRODUCTION NO. 9**:    All documents concerning the changes, if any, in or to Plaintiffs' relationship with HMAS.

**REQUEST FOR PRODUCTION NO. 10:**    All communications, if any, Plaintiffs have exchanged with any person relating to or concerning HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 11**:    All documents and communications relating to or concerning Regina Gorog.

8

**REQUEST FOR PRODUCTION NO. 12**:    All    documents    and    communications relating to or concerning Elliot Gorog.

**REQUEST FOR PRODUCTION NO. 13**:    All    documents    and    communications concerning any executives, managers, supervisors, or other employees of HMAS, as related to Plaintiffs' HMAS health savings accounts.

**REQUEST FOR PRODUCTION NO. 14**:    Plaintiffs'    record(s)    of    payments    to HMAS.

**REQUEST FOR PRODUCTION NO. 15**:    All    documents    and    communications with reference, discuss, and/or evidence the promises HMAS made which are relevant to Plaintiffs' contract claim, as alleged in the Complaint.

**REQUEST FOR PRODUCTION NO. 16**:    All    documents    and    communications concerning Plaintiffs' allegation of "bait and switch," *see, e.g.*, Paragraph 1 of the Complaint.

**REQUEST FOR PRODUCTION NO. 17**:    All         documents         reflecting communications with and/or complaints, charges and/or inquiries to, if any, that Plaintiffs and/or any putative class member has made to any governmental agency about HMAS, ClaimChoice, and/or the allegations of the Complaint.

**REQUEST FOR PRODUCTION NO. 18**:    All    documents    and    communications concerning data and other information, if any, Plaintiffs have shared or communicated with, and/or transmitted, posted, and/or sent to any media outlet (such as any news organization or television group) about HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 19**:    All    documents    and    communications concerning data and other information, if any, Plaintiffs have shared or communicated with, and/or transmitted, posted, and/or sent to any social media site on the Internet about HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 20**:    All    documents    and    communications concerning the reduction, if any, in the number of claims paid on Plaintiffs' behalf by HMAS and/or ClaimChoice, after October 12, 2023.

**REQUEST FOR PRODUCTION NO. 21**:    All    documents    and    communications concerning the confiscation of fees and contributions, if any, by HMAS of Your HMAS health savings account, in whole or in part, *see, e.g.*, Paragraph 45 and subparts of the Complaint.

**REQUEST FOR PRODUCTION NO. 22**:  All written (hard copy or electronic) representations, promises, and/or statements by HMAS, upon which Plaintiffs relied, which are relevant to Plaintiffs' contract claim as alleged in the Complaint.

**REQUEST FOR PRODUCTION NO. 23**:  All documents and communications concerning the "design" of HMAS accounts or plans, *see, e.g.*, Paragraph 27 of the Complaint.

**REQUEST FOR PRODUCTION NO. 24**:  All documents and communications concerning the actuarial consulting firm, "Milliman," regarding Your contract claim, *see, e.g.*, Paragraph 29 of the Complaint.

**REQUEST FOR PRODUCTION NO. 25**:  All documents and communications concerning the "attrition rate" of customers with HMAS *see, e.g.*, Paragraph 35 of the Complaint.

**REQUEST FOR PRODUCTION NO. 26**:  All documents and communications concerning the business model of HMAS, *see, e.g.*, Paragraph 36 of the Complaint.

**REQUEST FOR PRODUCTION NO. 27**:  All documents and communications concerning the alleged "confiscate[ion] of millions of dollars in account balances," *see, e.g.*, Paragraph 37 of the Complaint.

**REQUEST FOR PRODUCTION NO. 28**:  All communications (emails, texts, letters, memos, posts, etc.) You have had with, received from and/or made to Phil Burghardt of ClaimChoice concerning HMAS and/or ClaimChoice.

**REQUEST FOR PRODUCTION NO. 29**:  All text messages sent to and/or received from Phil Burghardt or anyone about HMAS and/or the statements/allegations in Paragraph 45 (and subparts) of the Complaint.

**REQUEST FOR PRODUCTION NO. 30**:  All text messages sent to and/or received from Regina Gorog or anyone associated with HMAS about HMAS and/or the statements/allegations in Paragraph 45 (and subparts) of the Complaint.

**REQUEST FOR PRODUCTION NO. 31**:  All text messages sent to and/or received from Elliot Gorog or anyone associated with HMAS about ClaimChoice and/or the statements/allegations in Paragraph 45 (and subparts) of the Complaint.

**REQUEST FOR PRODUCTION NO. 32**:  All notes, recordings, transcripts, and/or memos related to the referenced phone call on October 7, 2024, and/or related to any other phone calls, meetings, ZOOM or TEAMS (or the like) conferences, or in-

10

person discussions that have been conducted or done with Phil Burghardt with regard to HMAS, *see, e.g.*, Paragraph 45 (and subparts) of the Complaint.

**REQUEST FOR PRODUCTION NO. 33**:    All notes, recordings, transcripts and/or memos related to any phone calls, meetings, ZOOM or TEAMS (or the like) conferences, or in-person discussions that have been conducted or done with anyone with regard to HMAS.

**REQUEST FOR PRODUCTION NO. 34**:    All documents and communications concerning any alleged "phantom" money, *see, e.g.*, Paragraph 45 (and subparts) of the Complaint.

**REQUEST FOR PRODUCTION NO. 35**:    All documents and communications concerning the "insurance-like id card" referenced in Paragraph 46 of the Complaint.

**REQUEST FOR PRODUCTION NO. 36**:    All documents and communications concerning alleged "unprofessional behavior" by HMAS, *see, e.g.*, Paragraph 51 of the Complaint.

**REQUEST FOR PRODUCTION NO. 37**:    All documents concerning any alleged stealing and skimming of dollars from Class Member accounts, *see, e.g.*, Paragraph 55 of the Complaint.

**REQUEST FOR PRODUCTION NO. 38**:    All documents concerning the "myriad of new HMA-invented exclusions," *see, e.g.*, Paragraph 59 of the Complaint.

**REQUEST FOR PRODUCTION NO. 39**:    All documents concerning Your allegation that HMAS acted in "bad faith," *see, e.g.*, Paragraph 57 of the Complaint.