## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BOBBIE POPE, ET AL., | § | |
| *on behalf of themselves and others* | § | |
| *similarly situated*, | § | |
| | § | NO: 4:24-cv-04611 |
| *Plaintiffs*, | § | Judge Ellison |
| | § | |
| v. | § | |
| | § | |
| HEALTH MATCHING | § | |
| ACCOUNT SERVICES, INC., | § | |
| | § | JURY TRIAL DEMANDED |
| *Defendant*. | § | |

_____

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## EMERGENCY MOTION TO APPOINT RECEIVER

ALEXANDER LOFTUS, Esq.
**LOFTUS & EISENBERG, LTD.**
181 W Madison, Suite 4700
Chicago, Illinois 60602
Ph: 312.899.6625
alex@loftusandeisenberg.com

*- and -*

JAMES CREWSE, Esq.
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph: 214.394.2856
jcrewse@crewselawfirm.com

*ATTORNEYS FOR PLAINTIFFS*
*AND THE PROPOSED CLASS*

# TABLE OF CONTENTS

I. INTRODUCTION: THE EMERGENCY ARISES FROM A MASSIVE HEALTHCARE FRAUD AND FBI RAID ............................................................. 1

II. THE COURT'S COMPREHENSIVE AUTHORITY TO ACT3A.RULE 66 PROVIDES PROCEDURAL AUTHORITY ............................................................ 3

III.THE CONTROLLING LEGAL FRAMEWORK DEMANDS RECEIVERSHIP ......................................................................................... 4

IV. THE FRAUDULENT SCHEME: DEFENDANTS' OWN WORDS CONDEMN THEM ............................................................................................ 7

V. FRAUD PLUS ACTIVE DISSIPATION JUSTIFIES IMMEDIATE CONTROL ................................................................................................... 8

VI. DETAILED APPLICATION: EVERY NETSPHERE ELEMENT SATISFIED9VII.PUBLIC INTEREST AND HEALTH-SAFETY HARMS HEIGHTEN THE EQUITIES ................................................................................. 11

VIII. DETAILED APPLICATION: EVERY SANTIBANEZ FACTOR SATISFIED ................................................................................................... 12

IX.PROPOSED RECEIVER AND COUNSEL ........................................................ 14

A. NICK FOLEY OF TRINITY RIVER ADVISORS AS PROPOSED RECEIVER ..................................................................................................... 14

X.IMMEDIATE AVAILABILITY AND COST EFFICIENCY ................................ 16

XI. THE CHOICE OF RECEIVER AND COUNSEL IS DELIBERATE AND PLANNED NEARLY A YEAR IN ADVANCE ........................................................ 17

XII.COORDINATION WITH CRIMINAL AUTHORITIES IS A RECOGNIZED RECEIVERSHIP FUNCTION .................................................................................. 18

XIII.THE FEDERAL GOVERNMENT SHUTDOWN CREATES ADDITIONAL URGENCY FOR PRIVATE RECEIVERSHIP ......................................................... 19

XIV.THE RECEIVER'S COMPREHENSIVE POWERS UNDER FIFTH CIRCUIT LAW ...................................................................................................... 20

A. IMMEDIATE CONTROL AND MARSHALING OF RECEIVERSHIP ASSETS ................................................................................................................. 20

B. OPERATIONAL AUTHORITY TO PRESERVE ESTATE VALUE ................... 21

C. LITIGATION POWERS TO AUGMENT THE ESTATE ................................... 21

D. AUTHORITY TO STAY COMPETING LITIGATION.......................................22

E. CLAIMS ADMINISTRATION AND DISTRIBUTION AUTHORITY ..............22

F. COORDINATION WITH GOVERNMENTAL AUTHORITIES.........................22

G. AUTHORITY TO EMPLOY PROFESSIONALS ................................................23

H. ASSET LIQUIDATION AUTHORITY ................................................................24

I. ESSENTIAL LIMITATIONS PROTECTING DUE PROCESS ...........................24

J.  APPLICATION TO THE PRESENT EMERGENCY .........................................25

XV. CONCLUSION: IMMEDIATE ACTION IS IMPERATIVE ...........................25

# TABLE OF AUTHORITIES

*Alan D. Whatley v. Robert E. Philo*, 817 F.2d 19 (5th Cir. 1987)..............................6

*Arkansas Louisiana Gas Co. v. H. A. Kroeger*, 303 F.2d 129 (5th Cir. 1962)...........6

*Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993)......4

*Cadence Bank v. Tritgen, LLC*, No. 4:24-cv-01266 (S.D. Tex. Apr. 10, 2024).........13

*Capital Fin., LLC v. 22 Maple St., LLC*, 295 F. Supp. 3d 19 (D.D.C. 2018) ............11

*CFTC v. TMTE, In*c., No. 3:20-cv-02910, 2022 WL 1639145, 2022 U.S. Dist. LEXIS 8450 (N.D. Tex. Sept. 30, 2020) ....................................................................13

*Davis v. Bayless*, 70 F.3d 367 (5th Cir. 1995)............................................................22

*Digital Media Solutions v. South Univ. of Ohio, LLC*, 59 F.4th 772 (6th Cir. 2023). 21

*In re Stanford International Bank Ltd.*, 842 F.3d 1146 (5th Cir. 2016)......................22

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) ......................................................9, 20

*Jarrett E. Woods, Jr. v. Federal Home Loan Bank Board*, 826 F.2d 1400 (5th Cir. 1987)...........................................................................................................................6

*Kairos Credit Strategies Operating Partnership, LP v. The Friars National Association, Inc*., No. 1:23-cv-02960 (S.D.N.Y. May 26, 2023)...............................11

*Miguel Rishmague v. Robert Winter*, 616 F. App'x 138 (5th Cir. 2015) ..................22

*Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012) ............................................ *Passim*

*Quilling v. Schonsky*, No. 3:05-cv-02122 (N.D. Tex. Dec. 19, 2006) .......................21

*Rio Verde Plantas, LLC v. O&S Holdings, LLC*, No. 3:25-cv-00098 (D. Or. Mar. 21, 2025).....................................................................................................................4

*Ritchie Special Credit Investments, Ltd. v. United States Trustee*, No. 0:09-cv-00680 (D. Minn. Sep 8, 2009).................................................................................23

*RLI Insurance Co. v. Nexus Services, Inc*., No. 5:18-cv-00066 (W.D. Va. May 17, 2024)...........................................................................................................................8

*Santibanez v. Wier McMahon & Co*., 105 F.3d 234 (5th Cir. 1997)........................4, 12

*SEC v. Amerifirst Funding Inc*., No. 3:07-cv-01188, 2008 WL 919546 (N.D. Tex. Mar. 11, 2008).........................................................................................................24

*SEC v. Bryant*, No. 4:17-cv-00336, 2019 WL 4059089, 2019 U.S. Dist. LEXIS 140306 (E.D. Tex. Aug. 15, 2017)............................................................6

*SEC v. GPB Capital Holdings, LLC*, No. 1:21-cv-00583 (E.D.N.Y. Jul. 28, 2023)..8

*SEC v. Krishnan*, No. 4:23-cv-00885 (E.D. Tex. June 20, 2024) .............................20

*SEC v. Stanford Int'l Bank, Ltd*., 424 F. App'x 338 (5th Cir. 2011) ........................22

*SEC v. Stanford Int'l Bank, Ltd.,* 927 F.3d 830 (5th Cir. 2019) ...............................21, 22

*SEC v. Timothy Barton*, 79 F. 4th 573, No. 24-10004 (5th Cir. Apr. 17, 2025).........6, 9

*SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980)..........................................................22

*Trust, National Association v. Winta Asset Management LLC*, No. 1:20-cv-05309 (S.D.N.Y. Sept. 28, 2020) ...........................................................................................4, 9

*U.S. Bank Nat'l Ass'n v. Lakeview Retail Property Owner LLC*, No. 1:15-cv-00404, 2016 WL 683391, 2016 U.S. Dist. LEXIS 19934 (S.D. Miss. Feb. 16, 2016)............................................................................................................................13

*United States v. Camacho*, No. 4:13-cv-00100, 2013 WL 11327166 (S.D. Tex. Nov. 18, 2013) ...........................................................................................................3

*United States v. Internet Transactions Services, Inc*., No. 2:21-cv-06582 (C.D. Cal. Sept. 2, 2021) .....................................................................................................18

*United States v. Rich*, 2010 U.S. App. LEXIS 9079 (9th Cir. 2010) ........................18

*Wilmington Trust, National Association v. Winta Asset Management LLC*, No. 1:20-cv-05309, 2020 WL 5800030 (S.D.N.Y. Sept. 28, 2020) ................................9

Elliot Gorog called it what it was: "my Ponzi scheme." Now victims need their money, providers need payment, and only this Court can prevent total catastrophe. Every factor, every precedent, every equitable consideration points to one conclusion: appoint a receiver today. This memorandum demonstrates why every legal standard compels immediate appointment of a receiver. The Court possesses clear authority under Federal Rule of Civil Procedure 66 and 28 U.S.C. § 3103. The Fifth Circuit's *Netsphere* and *Santibanez* tests authorize receivership when property faces imminent danger and legal remedies fail—precisely this case. Due process permits emergency action when post-deprivation procedures protect defendants' rights. Every factor, every precedent, every equitable consideration points to one conclusion: appoint a receiver today.

## I. INTRODUCTION: THE EMERGENCY ARISES FROM A MASSIVE HEALTHCARE FRAUD AND FBI RAID

This emergency motion arises from the catastrophic collapse of Health Matching Account Services, Inc. ("HMA"), a healthcare account administrator that defrauded thousands of consumers nationwide before being raided by the FBI on October 23, 2025. The procedural history leading to this motion reveals both the scope of the fraud and the urgent need for receivership.

HMA purported to operate as a legitimate healthcare account administrator offering employer-sponsored health benefit plans. (Complaint ¶¶ 12-14, ECF No. 1). The company promised to provide "Unrestricted Health Matching Accounts" where HMA would match customer contributions dollar-for-dollar, allowing customers to build healthcare savings for medical expenses. (Id. ¶¶ 15-16). HMA marketed these accounts as providing "100% coverage" for healthcare costs through a combination of customer contributions and HMA's promised matching funds. (Id. ¶¶ 17-18). The scope of HMA's operations was substantial. The company operated nationwide with approximately 30,000 customers who collectively deposited millions of dollars

into their healthcare accounts. (Id. ¶¶ 22-24). HMA contracted with numerous employers across multiple states to provide healthcare benefits to their employees. (Id. ¶¶ 25-26). Customers were required to make monthly contributions ranging from hundreds to thousands of dollars, with HMA promising to match these contributions and use the combined funds to pay medical claims. (Id. ¶¶ 28-30).

After Plaintiffs filed this lawsuit in December 2024, they engaged in aggressive discovery to uncover the truth about HMA's operations. This discovery effort met fierce resistance from both HMA and critical third parties. As detailed in Plaintiffs' Motion for Contempt (ECF No. 42), ClaimChoice Administrators, LLC—HMA's former third-party administrator—engaged in months of systematic obstruction despite being properly served with subpoenas on March 13, 2025 and April 1, 2025. The breakthrough came on June 4, 2025, when ClaimChoice finally produced two pages of explosive text messages between Elliot Gorog (HMA's principal) and Phil Burghardt (ClaimChoice's CEO). These messages contained devastating admissions, including Gorog's acknowledgment that HMA was operating as "my Ponzi scheme" and his instructions to "pocket the savings" from customer accounts. (Motion for Contempt at 2, ECF No. 42). ClaimChoice promised complete production would follow "about a week away" but then deliberately withheld all remaining documents, leading to this Court's July 10, 2025 show cause order and ultimately Plaintiffs' Motion for Contempt filed August 15, 2025. (*Id*. at 2-3).

At approximately the same time ClaimChoice produced the damning text messages, Holly Shelton, HMA's former employee, came forward as a whistleblower. Ms. Shelton provided detailed statements confirming that the matching funds promised to customers "technically doesn't exist" and were merely "phantom" numbers in a computer system. She revealed that customer accounts were "slush accounts" with no segregated funds and that she was instructed to lie to

customers about claim payment status. *See* (Shelton Transcript, Exhibit "B" to Loftus Declaration). Armed with this new evidence, Plaintiffs shared their proposed Amended Complaint with Defendants in early September 2025, adding detailed fraud claims based on the text message admissions and Shelton's statement. The amended complaint documented how Gorog admitted to operating a "Ponzi scheme," instructed staff to "stiff the hospital," and bragged about throwing "at least 30 claims in the trash."

Faced with these devastating revelations and the prospect of defending against documented fraud claims, HMA finally capitulated. On September 25, 2025, the parties voluntarily agreed to mediate all issues. (Joint Agreed Motion to Stay at ¶ 1, ECF No. 56). The mediation was scheduled with Hon. John T. Wooldridge, a Senior Texas State Court Judge and experienced mediator, for December 5, 2025—the earliest available date given Judge Wooldridge's calendar. (Id. at ¶¶ 2-3). On October 3, 2025, this Court granted the parties' Joint Agreed Motion to Stay (ECF No. 56), ordering that "All activity in this litigation shall be STAYED until thirty (30) days after the planned mediation." (Order Granting Motion to Stay at 1, ECF No. 59). The Court further ordered that "All pending motions are hereby DISMISSED WITHOUT PREJUDICE to refiling should the mediation be unsuccessful." (Id.). If mediation fails, the parties must file an agreed proposed schedule by January 5, 2026 for class certification proceedings. (Id.). Importantly, the stay order specifically states: "With this stay, no further action will be taken by the Parties, except as needed to prepare for and participate in mediation." (Id. at 2). The parties' agreement included that they would "not take any further action in this controversy, except as needed to prepare for and participate in the scheduled mediation." (Joint Agreed Motion to Stay at ¶ 9, ECF No. 56).

On October 23, 2025—just twenty days after the stay was entered and while the parties were preparing for mediation—the FBI executed search warrants at HMA's Houston offices. The FBI

seized all business records, froze all accounts, and shut down all operations. HMA ceased to exist as a functioning entity overnight. The 10,000 customers who had entrusted their healthcare savings to HMA suddenly found themselves unable to access their funds, submit claims, or reach anyone at the company.

The instant emergency motion for appointment of a receiver is not subject to the Court's stay order for three critical reasons. First, the FBI raid occurred after the stay was entered and fundamentally changed the circumstances—HMA no longer exists as a functioning entity capable of participating in mediation. Second, the stay contemplates "no further action" except to prepare for mediation, but a non-existent company cannot meaningfully mediate, and emergency relief is necessary to protect 10,000 consumers' healthcare funds from total loss. Third, the equitable exception to any stay applies when circumstances change so dramatically that enforcement would work severe injustice—here, requiring victims to wait until after a December 5 mediation while their healthcare funds remain frozen and inaccessible would cause irreparable harm. The FBI's raid has transformed this from a civil dispute amenable to mediation into an emergency requiring immediate judicial intervention. Every day without a receiver means diabetics go without insulin, cancer patients miss chemotherapy, and digital records corrupt beyond recovery. This Court must act now to protect these victims, regardless of the previously scheduled mediation.

## II.  THE COURT'S COMPREHENSIVE AUTHORITY TO ACT A. RULE 66 PROVIDES PROCEDURAL AUTHORITY

Federal Rule of Civil Procedure 66 incorporates "the historical practice in federal courts" for appointing receivers. The rule states: "These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued. But the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule." Fed. R. Civ. P. 66. The Fifth Circuit confirms this grants broad

discretion: "Rule 66 vests the district court with broad discretion to determine whether appointing a receiver is justified." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012). This discretion "derives from the Court's inherent equitable powers and is subject to abuse of discretion review. The decision to appoint a receiver turns on the facts and equities of each case." *Id*. at 305-06.

28 U.S.C. § 3103 states: "A receiver may be appointed by the court when it appears that a party has an interest in property that is in danger of being removed, lost, concealed, materially injured or damaged, or mismanaged." While § 3103 technically applies to government actions, this Court recognizes "its factors reflect the larger standards applied in equity receiverships." *United States v. Camacho*, No. 4:13-cv-00100, 2013 WL 11327166, at *2 (S.D. Tex. Nov. 18, 2013). Every § 3103 factor exists here. The property faces danger of removal as assets will vanish without management. Loss is certain as customer funds face total destruction. Concealment is ongoing as records remain hidden in FBI custody. Injury accelerates daily as digital infrastructure degrades. Mismanagement is absolute as no management exists at all.

"A receiver is an officer of the court and must act under the court's direction and instruction." *Netsphere*, 703 F.3d at 306. The receiver serves as the Court's agent, preserving property, protecting interests, and ensuring equitable distribution. The Court maintains continuous supervision through reporting requirements and modification procedures.

## III.   THE CONTROLLING LEGAL FRAMEWORK DEMANDS RECEIVERSHIP

*Netsphere* establishes three mandatory elements: clear necessity to protect property, inadequacy of legal remedies, and benefits outweighing burdens. 703 F.3d at 305. This framework is not unique to the Fifth Circuit but reflects nationwide consensus on receivership standards. The Second Circuit treats these elements as "near-universal," explaining that a receiver is warranted when fraud or mismanagement places property in imminent jeopardy and lesser remedies will not

suffice. , *Trust, National Association v. Winta Asset Management LLC*, No. 1:20-cv-05309 (S.D.N.Y. Sept. 28, 2020). The Eastern District of Michigan echoed this view this year, stressing that "no single factor is dispositive" and that deadlock and depletion of corporate assets can alone supply "clear necessity." *Rio Verde Plantas, LLC v. O&S Holdings, LLC*, No. 3:25-cv-00098 (D. Or. Mar. 21, 2025). Each element requires detailed findings with specific evidence. *SEC v.* 79 F. 4th 573, No. 22-11132 (5th Cir. June 28, 2023), reversed a receivership with merely conclusory findings. *SEC v. Timothy Barton*, 79 F. 4th 573, No. 24-10004 (5th Cir. Apr. 17, 2025), affirmed when the district court tied findings to evidence.

Santibanez v. Wier McMahon & Co., 105 F.3d 234, 241-43 (5th Cir. 1997), provides the detailed framework comprising validity of the plaintiff's claim, probability of fraud or risk of dissipation, imminent danger to property, inadequacy of legal remedies, absence of less drastic alternatives, and likelihood that appointment will do more good than harm. These factors guide rather than constrain the Court's equitable analysis. *See Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.,* 999 F.2d 314, 316-17 (8th Cir.1993).

Emergency relief satisfies due process when circumstances demand immediate action and defendants receive prompt post-deprivation review. *SEC v. Bryant*, No. 4:17-cv-00336, 2019 WL 4059089, 2019 U.S. Dist. LEXIS 140306 (E.D. Tex. Aug. 15, 2017), requires only that "the risk of an erroneous deprivation is small" and "meaningful post-deprivation procedures" exist. *Alan D. Whatley v. Robert E. Philo*, 817 F.2d 19, 21 (5th Cir. 1987), confirms that pre-deprivation hearings yield to post-deprivation review in emergencies. The proposed order provides comprehensive procedures including a show-cause hearing within 10 days, immediate asset inventory, modification procedures, and continuous court oversight. Federal courts have upheld even more expedited proceedings. In *Arkansas Louisiana Gas Co. v. Kroeger* the panel reiterated that,

although notice is the norm, "where the giving of notice is impracticable … or where the giving of notice would defeat the very purpose of the receivership, it is within the discretion of the court to make an ex parte appointment," and that any challenge to such an appointment must be made by direct appeal rather than collateral attack. *Arkansas Louisiana Gas Co. v. H. A. Kroeger*, 303 F.2d 129 (5th Cir. 1962); *see also Jarrett E. Woods, Jr. v. Federal Home Loan Bank Board, (Two Cases),* 826 F.2d 1400 (5th Cir. 1987).

## IV. THE FRAUDULENT SCHEME: DEFENDANTS' OWN WORDS CONDEMN THEM

This case presents something extraordinary: defendants who documented their own crimes. Elliot Gorog didn't just commit fraud—he bragged about it in writing. Elliot Gorog confessed: "It's my Ponzi scheme I can do what I want lol we actually caught a Donzi scheme in loving memory of Don Call it the donzi scheme." (Text Message Exhibit "A", ClaimChoice_ClassAction_0003548.txt). This isn't accusation—it's admission. Gorog celebrated destroying legitimate claims: "I'm almost done with the audit I promised Mommy last Friday, which was a MUST. I tossed at least 30 claims in the trash." (Exhibit "A" ClaimChoice_ClassAction_0000557.txt). He bragged about reducing payments by 77%: "Before phil my claims were 30k a day now they are 7k lol." (ClaimChoice_ClassAction_0003548.txt). He instructed staff to defraud providers: "stiff the hospital and wipe out the HMA account balances!! Lol 😂" (Exhibit "A" ClaimChoice_ClassAction_0002828.txt). Defendants promised to match customer contributions dollar-for-dollar. Hollie Shelton exposed the lie: "the money in their account technically doesn't exist. It's just a number on your account. There's no money actually associated with your specific account." (Shelton Transcript).

Regina Gorog controlled everything. Shelton explained: When Regina came in, if Regina felt like it, then they would make a check run. *See* (Shelton Transcript). Elliot described his mother's

approach: "I'm trying to tell Griselda a.k.a. my mom it's OK mom we don't have to rape and pillage all the time lol." (Exhibit "A", ClaimChoice_ClassAction_0002828.txt).

## V. FRAUD PLUS ACTIVE DISSIPATION JUSTIFIES IMMEDIATE CONTROL

Courts nationwide recognize that fraud coupled with ongoing asset dissipation eliminates any doubt about receivership necessity. The memorandum details Defendants' admissions, but additional authority coupling fraud with flight or concealment reinforces the "imminent danger" showing. In *RLI Insurance Co. v. Nexus Services, Inc.*, No. 5:18-cv-00066 (W.D. Va. May 17, 2024), the court confronted a sophisticated "shell game" that frustrated discovery and held that "incremental remedies have failed; there is no likelihood of recovery without a receiver." Similarly, the Eastern District of New York appointed a receiver in *Securities and Exchange Commission v. GPB Capital Holdings, LLC*, No. 1:21-cv-00583 (E.D.N.Y. Jul. 28, 2023), where indicted principals continued to move investor money despite an asset freeze, holding that "fraud coupled with ongoing asset flight leaves the Court no equitable alternative." Here, the fraud is admitted and the dissipation is automatic. Without anyone managing HMA's affairs, assets deteriorate by the hour. Digital records corrupt without maintenance. Customer data becomes irretrievable. The combination of admitted fraud and FBI-induced paralysis creates dissipation more severe than any shell game or asset flight.

## VI. DETAILED APPLICATION: EVERY *NETSPHERE* ELEMENT SATISFIED

Property faces immediate, catastrophic danger across multiple categories. Customer funds totaling $20 million sit frozen and unprotected, deteriorating through competing claims and administrative decay. Digital infrastructure containing at least 10,000 customer accounts and millions of claim records faces corruption without maintenance. Thousands of pending medical claims expire while patients suffer. *Janvey v. Alguire*, 647 F.3d 585, 599-600 (5th Cir. 2011),

supports receivership when dissipation of the assets would impair the court's ability to grant an effective remedy, especially with startlingly few assets to disperse to the victims. That describes this case perfectly. Recent Southern District of New York opinions sharpen these factual parallels. *Wilmington Trust, National Association v. Winta Asset Management LLC,* No. 1:20-cv-05309, 2020 WL 5800030 (S.D.N.Y. Sept. 28, 2020*)* found that "impairment above and beyond ordinary diminution" required equitable control. Here, every day of operational suspension inflicts unrecoverable economic loss exceeding these precedents.

Money damages solve nothing. A judgment cannot access FBI-seized records, process medical claims, preserve digital assets, recover stolen funds, or coordinate civil and criminal proceedings. Only a receiver can provide these essential functions. *Barton*, 79 F. 4th 573, confirms receivership is necessary when no other remedy provides "active management." The Fifth Circuit specifically rejected arguments that freezes or injunctions suffice when assets need management. Here, active management means processing emergency insulin claims today, paying for chemotherapy Monday, maintaining servers before they crash, and pursuing assets before they disappear. An injunction provides no management. A freeze provides no operations. A TRO provides no relief. Only a receiver solves the problem.

The balance overwhelmingly favors receivership. The benefits include 10,000 victims regaining healthcare access, $20 million preserved for distribution, stolen funds recovered through claw-back actions, evidence protected for criminal prosecution, orderly distribution replacing chaos, and criminal restitution becoming possible. The burdens amount to two confessed criminals losing control they already forfeited, the estate paying reasonable receiver fees, and no disruption to legitimate operations since none exist. The math is simple: massive benefit, minimal burden.

## VII. PUBLIC INTEREST AND HEALTH-SAFETY HARMS HEIGHTEN THE EQUITIES

Receivership is especially favored where vulnerable populations face immediate risk. When nursing-home operators could not pay insurance or meet licensing requirements, *Capital Fin., LLC v. 22 Maple St.*, LLC, 295 F. Supp. 3d 19 (D.D.C. 2018), held that "loss of coverage alone establishes imminent danger" and ordered a receiver to protect residents. The Southern District of New York reached the same conclusion in *Kairos Credit Strategies Operating Partnership, LP v. The Friars National Association, Inc.*, No. 1:23-cv-02960 (S.D.N.Y. May 26, 2023), where lapsed insurance placed a historic property at risk: "lack of coverage is itself irreparable harm." These holdings apply with even greater force to consumers whose frozen healthcare funds threaten immediate medical harm. While nursing home residents faced potential future harm from lapsed insurance, HMA's victims face actual, immediate inability to obtain insulin, chemotherapy, and cardiac medications. If theoretical insurance lapses justify receivership, actual medical emergencies compel it.

## VIII. DETAILED APPLICATION: EVERY *SANTIBANEZ* FACTOR SATISFIED

The *Santibanez* factors overwhelmingly support receivership. Plaintiffs present valid claims supported by Defendants' written confessions to operating a "Ponzi scheme," systematically pocketing customer payments, and destroying legitimate claims. The probability of fraudulent conduct is not speculative but admitted and documented through Defendants' own communications and corroborated by witness testimony. Imminent danger exists as the FBI seizure paralyzed all operations, leaving no employees, no management, and no mechanism to protect rapidly deteriorating assets. Legal remedies are wholly inadequate as demonstrated above. No less drastic alternative exists because expedited discovery cannot access FBI files, attachment cannot restart operations, garnishment cannot process claims, and preliminary injunctions cannot manage assets.

The balance of good versus harm tips decisively toward receivership. Protecting 10,000 fraud victims vastly exceeds any burden on two admitted criminals. *CFTC v. TMTE, Inc.*, No. 3:20-cv-02910, 2022 WL 1639145, 2022 U.S. Dist. LEXIS 8450 (N.D. Tex. Sept. 30, 2020), appointed a receiver for 1,600 elderly victims facing financial loss. Here, 10,000 healthcare consumers face medical emergencies, not just financial harm.

Recent cases demonstrate consistent application of these principles and provide direct support for receivership here. This Court appointed a receiver in *Cadence Bank v. Tritgen, LLC*, No. 4:24-cv-01266 (S.D. Tex. Apr. 10, 2024), finding imminent danger of operational cessation, inadequacy of legal remedies given complexity, absence of less-drastic alternatives, and balance favoring preservation. Here, the danger materialized as operations ceased completely, making the factors apply with even greater force. *CFTC v. TMTE, Inc.*, No. 3:20-cv-02910, 2022 WL 1639145, 2022 U.S. Dist. LEXIS 8450 (N.D. Tex. Sept. 30, 2020), appointed a receiver to protect elderly fraud victims, finding good cause to believe immediate and irreparable damage would occur from asset dissipation, balance favoring 1,600 victims, and public interest in halting fraud. Here, 10,000 victims face medical emergencies, not just financial loss, creating even more compelling circumstances. *U.S. Bank Nat'l Ass'n v. Lakeview Retail Property Owner LLC*, No. 1:15-cv-00404, 2016 WL 683391, 2016 U.S. Dist. LEXIS 19934 (S.D. Miss. Feb. 16, 2016), denied emergency relief where the movant defaulted and sought tactical delay, finding no irreparable harm beyond economic loss. That case is readily distinguished as Plaintiffs here are victims not defaulters, healthcare creates true emergencies not just economic loss, the FBI seizure created genuine crisis not tactical maneuvering, and no dilatory motive exists.

## IX.    PROPOSED RECEIVER AND COUNSEL A. NICK FOLEY OF TRINITY RIVER ADVISORS AS PROPOSED RECEIVER

Plaintiffs propose Nick Foley of Trinity River Advisors, LLC ("TRA") as receiver. Mr. Foley brings unparalleled expertise in managing distressed business situations requiring immediate intervention and coordination with law enforcement. Mr. Foley founded TRA and has over 30 years of experience in distressed business opportunities. His qualifications include:

- Former CPA with extensive financial restructuring experience
- Attorney who has led complex business litigation and bankruptcy matters
- Experience representing clients on contingency basis in significant cases for MatlinPatterson and other major investors
- Participation in numerous distressed investments including DIP loans
- Leadership of business studies resulting in successful sales of businesses

Trinity River Advisors' recent engagements demonstrate its capability to handle the precise challenges this receivership presents:

a.**Tommy's Boats** ($120 million): Appointed as Trustee by the U.S. Trustee to manage a retailer with 15 dealerships across 8 states. TRA controlled and liquidated $100 million of inventory, sold all 15 dealership locations, and negotiated litigation settlements worth several million dollars—demonstrating the exact skills needed to manage HMA's multi-state customer base and frozen operations.

b.**Robert Allen Stanford Ponzi Scheme**: Assisted in cases against professionals retained by Stanford including $40,000,000 settlement with BDO.

c.**Imperium** ($100 million): Brought in by secured creditors after default by an EV battery startup. TRA reduced burn rate from $2 million per week to $600,000, managed bidding processes, and maximized recovery—skills directly applicable to reducing HMA's ongoing losses and preserving value.

d.**Coherent Logix** ($100 million): Reduced burn rate from $6 million per month to $800,000, protected intellectual property assets, and found buyers while managing complex litigation—precisely the cost control and asset preservation needed here.

e. **Uhnder, Inc.** ($100 million): After default by a tech startup, TRA reduced burn rate from $2 million per month to $250,000 and sold assets to Honeywell and Bosch—demonstrating ability to preserve value while finding strategic buyers.

f.**Eventide Credit**: Currently managing complex litigation involving multiple bankruptcy estates and tort claims exceeding $50 million—experience directly relevant to coordinating HMA's civil claims with criminal proceedings. TRA's team includes professionals with decades of experience addressing distressed businesses, including Chris Armstrong (former PwC/FTI Senior Managing Director with C-Suite leadership experience) and Mark Andrews (lawyer with over 35 years of debt restructuring experience who has headed bankruptcy sections for AmLaw 200 firms).

g.TRA is frequently engaged by the Department of Justice to act as Receiver in cases involving fraud proseuctions.

Mr. Foley will be represented by Terence G. Banich of Katten Muchin Rosenman LLP, one of the nation's most experienced federal receivership lawyers. Mr. Banich brings over 20 years of experience managing complex litigation in federal equity receiverships and has represented federal equity receivers in civil enforcement actions commenced by the Securities and Exchange Commission, Federal Trade Commission, and private plaintiffs. Mr. Banich's directly relevant experience includes:

a. **SEC Receivership Expertise**: Currently serves as principal attorney for a federal equity receiver appointed to investigate transactions and recover assets resulting from the largest Ponzi

scheme perpetrated in the Central District of California—precisely the experience needed to coordinate with the FBI and pursue recovery in this admitted Ponzi scheme.

b. **Asset Recovery Success**: Represented federal equity receiver in recovering approximately 68% of investor funds in litigation arising out of an SEC civil enforcement action against a church organization for improperly selling securities to its congregation—demonstrating proven ability to maximize victim recovery.

c. **Healthcare Sector Experience**: Represented parties in healthcare company bankruptcies including hospitals, doctor groups, and senior housing—understanding the unique challenges of healthcare-related financial fraud.

d. **Fraudulent Transfer Litigation**: Managed several related fraudulent transfer adversary proceedings on behalf of Chapter 7 trustees involving complex issues, including first-chairing multi-day bench trials resulting in favorable judgments and settlements—essential for pursuing claw-back actions against the Gorogs and other insiders.

e. **Cross-Border Asset Recovery**: Represented real estate developers and machine tool distributors in Chapter 11 proceedings involving international assets—relevant given the risk of offshore asset transfers. The combination of Mr. Foley's business restructuring expertise and Mr. Banich's receivership litigation experience creates the ideal team to: Coordinate immediately with the FBI to access seized records; process emergency medical claims; Pursue fraudulent transfers and insider recoveries; Maximize restitution for 10,000 victims; Bridge civil and criminal proceedings effectively.

### A.  IMMEDIATE AVAILABILITY AND COST EFFICIENCY

Both Mr. Foley and Mr. Banich are available to begin work immediately upon appointment. TRA's track record demonstrates consistent ability to reduce operational costs dramatically—

critical when every day costs victims $100,000 in lost value. In Tommy's Boats, TRA reduced costs while protecting $100 million in assets. In Imperium, TRA cut burn rate by 70%. This cost discipline ensures maximum recovery for victims rather than administrative expenses. The proposed team's experience with U.S. Trustees, secured creditors, and federal agencies ensures smooth coordination with all stakeholders, including the FBI, DOJ, and affected healthcare providers.

### B. THE CHOICE OF RECEIVER AND COUNSEL IS DELERATE AND PLANNED NEARLY A YEAR IN ADVANCE

Plaintiff's complaint filed nearly a year ago sought a Receiver and counsel has been working on a plan to clean up HMA since. The selection of Nick Foley and Terence Banich is not arbitrary but strategic. This case requires a receiver who can immediately coordinate with criminal authorities while managing a complex healthcare business crisis. Mr. Foley's Trinity River Advisors has repeatedly demonstrated these exact capabilities. When Tommy's Boats collapsed with $120 million in debt across 15 locations in 8 states, the U.S. Trustee turned to TRA. The firm controlled and liquidated $100 million in inventory while negotiating multi-million-dollar settlements—precisely the multi-state asset management and recovery work required here. When Imperium's secured creditors faced a hemorrhaging EV battery startup, TRA reduced the burn rate from $2 million weekly to $600,000, then found strategic buyers. HMA similarly hemorrhages value daily without management. Mr. Banich's representation of SEC receivers in Ponzi scheme cases provides the exact blueprint for this receivership. His current work as principal attorney for the receiver in the Central District of California's largest Ponzi scheme demonstrates his ability to coordinate with federal law enforcement while maximizing victim recovery. His 68% recovery rate for church congregation investors who were sold fraudulent securities shows his effectiveness in recovering funds for vulnerable victims. Together, this team has managed federal receiverships,

coordinated with the FBI and DOJ, reduced operational costs by 70-90%, recovered fraudulently transferred assets, and returned substantial funds to victims. No other team combines immediate availability, proven cost discipline, healthcare sector experience, and demonstrated success in FBI-related receiverships. The Court need not speculate about this team's capabilities. Their track record speaks: businesses stabilized, costs slashed, assets recovered, victims compensated. That is precisely what 10,000 HMA victims need today.

## X.    COORDINATION WITH CRIMINAL AUTHORITIES IS A RECOGNIZED RECEIVERSHIP FUNCTION

Defendants may argue that the FBI's seizure of records makes receivership superfluous. Courts reject that contention and recognize that coordination between civil receivers and criminal authorities serves both proceedings. In *United States v. Internet Transaction Service*s, Inc., No. 2:21-cv-06582 (C.D. Cal. Sept. 2, 2021), Judge Fitzgerald appointed a receiver "explicitly authorized to coordinate with federal law-enforcement agencies and ensure assets are available for restitution, forfeiture, or other legal remedies." The Ninth Circuit likewise sustained a receivership in *United States v. Rich*, 2010 U.S. App. LEXIS 9079 (9th Cir. 2010), that survived even after conviction because "its purpose—to marshal assets for victim restitution—was independent of the criminal judgment." These decisions establish that a court-appointed fiduciary is the natural bridge between this Court and the FBI. The receiver can access seized records while preserving them for prosecution, process victim claims while maintaining evidence integrity, pursue asset recovery while coordinating with criminal forfeiture, and ensure civil restitution complements criminal penalties. Without a receiver, the civil and criminal proceedings will conflict rather than complement each other.

## XI.  THE FEDERAL GOVERNMENT SHUTDOWN CREATES ADDITIONAL URGENCY FOR PRIVATE RECEIVERSHIP

The appointment of a private receiver has become even more critical due to the federal government shutdown that began on October 1, 2025. The Department of Justice's own FY 2026 Contingency Plan, issued September 29, 2025, severely limits federal prosecutors' ability to address civil matters affecting HMA's victims. (Exhibit "B" Contingency Plan attached hereto and incorporated herein).

According to the DOJ Contingency Plan, "Civil litigation will be curtailed or postponed to the extent that this can be done without compromising to a significant degree the safety of human life or the protection of property." The plan explicitly states that "Litigators will approach the courts and request that active cases, except for those in which a delay would compromise to a significant degree the safety of human life or the protection of property, be postponed until funding is available." While the U.S. Attorney's offices have some excepted employees for "ongoing criminal matters and civil matters of urgency throughout the Nation," the plan makes clear that "Civil litigation will be curtailed or postponed" and "Headquarters support is maintained only to the extent necessary to support excepted operations."

The DOJ Contingency Plan confirms that of 115,131 total DOJ employees, only 102,291 are excepted from furlough. More critically, for the U.S. Attorneys' offices that would typically handle fraud recovery for victims, only 7,368 of 11,191 employees remain working—and these are primarily focused on criminal prosecutions, not civil recovery. The plan states unequivocally: "Criminal litigation will continue without interruption as an activity essential to the safety of human life and the protection of property." However, civil recovery actions for fraud victims—the very relief HMA's customers need—fall into the category of litigation that "will be curtailed or postponed."

While the FBI's criminal investigation continues as an excepted activity under the shutdown (all 36,755 FBI employees are excepted), criminal prosecution serves different goals than civil recovery. The DOJ Contingency Plan acknowledges this limitation, noting that civil matters will proceed only "to the extent that this can be done without compromising to a significant degree the safety of human life or the protection of property." The reality is stark: even if the government wanted to help HMA's 10,000 victims recover their healthcare funds, it lacks the personnel to do so during the shutdown. The U.S. Attorneys' offices have furloughed 34% of their staff. The Civil Division has furloughed 42% of its attorneys. These are precisely the personnel who would normally pursue civil recovery for fraud victims.

The DOJ Contingency Plan makes the case for private receivership. While the government must "curtail or postpone" civil litigation, a private receiver appointed by this Court faces no such restrictions. The receiver can begin work immediately, without waiting for Congress to fund the government. The plan notes that during shutdowns, "Employees may not be reassigned or given new duties, and offices may not be restructured, in order to move individuals from a non-excepted function into an excepted function." This means the government cannot simply redirect resources to help HMA's victims—the shutdown rules prohibit it. Furthermore, the plan states that "Receipt of summonses, pleadings and motions by mail may be delayed" during the shutdown. Every day of delay means HMA's victims wait longer for relief, digital records degrade further, and assets dissipate more completely.

The DOJ Contingency Plan acknowledges that components may need to "call some employees back to work if the need for their services becomes critical" but only in "the event of an extended lapse in appropriations." There is no guarantee when the shutdown will end or when full DOJ services will resume. The plan explicitly states that even training for state and local law

enforcement "should be cancelled during a lapse of appropriations" except in "exceptional circumstances" where "there is a reasonable and articulable connection between the training and the safety of human life or the protection of property."

The federal government shutdown has created a perfect storm: the FBI has seized HMA's records (as an excepted criminal function), but the civil attorneys who could help victims recover their money are furloughed. The criminal prosecutors who remain cannot provide civil restitution. The result is 10,000 victims trapped in bureaucratic limbo. As the DOJ Contingency Plan makes clear, the Department "will only continue" activities that are "funded by a source that has not lapsed," have "express authority to continue," protect against "emergencies involving the safety of human life," or relate to "the President's constitutional duties." Civil recovery for fraud victims meets none of these exceptions. A private receiver however, will remain fully operational. The DOJ Plan notes that it "assumes that the Judicial Branch will continue to operate." By appointing a private receiver, this Court can provide the relief that the executive branch cannot deliver during the shutdown. The government shutdown transforms an already urgent situation into a crisis demanding immediate judicial intervention. Every day this Court delays is another day the federal government cannot help these victims—not because it doesn't want to, but because the shutdown legally prohibits it from doing so.

## XII.   THE RECEIVER'S COMPREHENSIVE POWERS UNDER FIFTH CIRCUIT LAW

The appointment of a receiver will vest this Court's officer with broad but carefully defined powers essential to protecting the many victims of HMA's fraud. Federal Rule of Civil Procedure 66 incorporates the historical practice in federal courts and vests the district court with broad discretion to shape the receiver's authority. *See Netsphere,* 703 F.3d 296, 305. These established powers provide precisely the tools needed to address this emergency.

## A. IMMEDIATE CONTROL AND MARSHALING OF RECEIVERSHIP ASSETS

Upon appointment, the receiver obtains complete and exclusive control, possession, and custody of all assets within the receivership estate. *See Janvey*, 647 F.3d 585, 591. The receiver must use "reasonable efforts to determine the nature, location, and value of all property interests." *SEC v. Krishnan*, No. 4:23-cv-00885, at *3 (E.D. Tex. June 20, 2024).

## B. OPERATIONAL AUTHORITY TO PRESERVE ESTATE VALUE

When receivership property includes an ongoing business enterprise, the receiver possesses authority to manage, control, operate, and maintain the enterprise to preserve its value. *Digital Media Solutions v. South Univ. of Ohio, LLC*, 59 F.4th 772, 778 (6th Cir. 2023). This includes paying expenses, securing insurance, and retaining professionals as necessary, all subject to court oversight. *Barton* 79 F. 4th 573, 580.

The operational authority extends to all actions necessary to preserve and maximize estate value. In HMA's case, this encompasses restarting claims processing operations to serve the 10,000 stranded customers, processing emergency medical claims to prevent loss of life or serious health consequences, maintaining and restoring the digital infrastructure that contains all customer records, hiring necessary personnel to evaluate and process claims, and securing appropriate insurance to protect estate assets during administration.

## C. LITIGATION POWERS TO AUGMENT THE ESTATE

The receiver "stands in the shoes" of the receivership entities and possesses full authority to "bring or defend claims that the entity itself could have brought or defended." *Janvey*., 712 F.3d at 189. However, the receiver "may not assert claims unique to third parties or investors." *SEC v. Stanford Int'l Bank, Ltd*., 927 F.3d 830, 841 (5th Cir. 2019).

Within these parameters, the receiver's litigation authority encompasses pursuing fraudulent transfer actions to recover diverted funds, as specifically endorsed in *Quilling v. Schonsky*, No. 3:05-cv-02122 (N.D. Tex. Dec. 19, 2006). The receiver may void preferential payments made while the entity was insolvent, recover funds that Elliot Gorog admitted to "pocketing" from customer accounts, defend against lawsuits threatening estate assets, and settle claims with court approval when beneficial to the estate. *Stanford*, 927 F.3d at 841.

## D. AUTHORITY TO STAY COMPETING LITIGATION

The Fifth Circuit recognizes that "it is axiomatic that a district court has broad authority to issue blanket stays of litigation to preserve the property placed in receivership.", 927 F.3d 830, 840. This authority derives from both the court's inherent equitable power and the All Writs Act, 28 U.S.C. § 1651, which permits orders "necessary or appropriate to effectuate and prevent the frustration of" the court's jurisdiction. Stanford, 927 F.3d at 840.

The litigation stay serves three essential purposes identified in *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980), and adopted by the Fifth Circuit in Stanford. First, it preserves the status quo preventing assets from being dissipated piecemeal through uncoordinated litigation. Second, it centralizes claims in a single forum, avoiding duplicative costs that would erode the estate. Third, it protects the receiver from being "forced into court by every investor or claimant" before having opportunity to marshal and value the estate. *Stanford*, 927 F.3d at 840.

The stay should enjoin "all persons" from "commencing, prosecuting, or maintaining" any action against the receivership entities absent leave of court, following the model approved in *SEC v. Stanford Int'l Bank, Ltd.,* 424 F. App'x 338, 340 (5th Cir. 2011); *Miguel Rishmague v. Robert Winter*, 616 F. App'x 138, 139–40 (5th Cir. 2015). When parties seek relief from the stay, courts apply the three-factor *Wencke* test, examining whether refusing to lift the stay genuinely preserves

the status quo, the timing within the receivership when relief is sought, and the merit of the underlying claim. *Stanford Int'l Bank, Ltd*., 424 F. App'x 338, 341.

### E. CLAIMS ADMINISTRATION AND DISTRIBUTION AUTHORITY

Receivers possess authority to "administer a claims process, receive and examine claims, and propose a plan of distribution, mimicking bankruptcy practice." *Davis v. Bayless*, 70 F.3d 367, 374 (5th Cir. 1995). This process "must comply with due process, providing notice and opportunity to be heard." *Id*. The receiver establishes procedures for submitting claims, examines and validates claims against estate records, prioritizes claims based on court-approved criteria, and proposes distribution plans ensuring equitable treatment of similarly situated claimants.

For HMA's estate, this means establishing a streamlined process for 10,000 customers to submit claims for unpaid medical expenses and account balances, with special procedures for emergency medical needs requiring immediate attention.

### F. COORDINATION WITH GOVERNMENTAL AUTHORITIES

Receivers must coordinate with governmental agencies, particularly when there are parallel regulatory or criminal actions. *See In re Stanford International Bank Ltd.,* 842 F.3d 1146 (5th Cir. 2016); *Ritchie Special Credit Investments, Ltd. v. United States Trustee,* No. 0:09-cv-00680 (D. Minn. Sep 8, 2009). Additionally, 28 U.S.C. § 959(b) requires receivers to "manage and operate the property in [their] possession according to the requirements of the valid laws of the State in which such property is situated."

This coordination authority enables the receiver to work with the FBI to access seized records while preserving chain of custody for criminal proceedings, ensure civil recovery efforts complement rather than interfere with criminal prosecution, share information with law

enforcement to maximize total victim recovery, and comply with state healthcare and insurance regulations in processing claims.

## G.  AUTHORITY TO EMPLOY PROFESSIONALS

The receiver may "hire attorneys, accountants, and other professionals as approved by the court" to assist in administering the estate. *Netsphere,*, 703 F.3d 296, 306. Courts "scrutinize these expenses to ensure they do not deplete the estate" while recognizing that professional assistance often proves essential to maximizing recovery. *Id*.

The complex nature of HMA's healthcare fraud necessitates retention of specialized professionals including healthcare claims processors familiar with medical billing, IT specialists to preserve and restore corrupted digital infrastructure, forensic accountants to trace fraudulently transferred funds, medical consultants to evaluate emergency claims requiring immediate payment, and legal counsel experienced in fraudulent transfer litigation and asset recovery.

## H.  ASSET LIQUIDATION AUTHORITY

"With prior court approval and notice to interested parties, the receiver may sell assets of the estate" when the court finds that the sale is in the estate's best interest. *Securities and Exchange Commission v. Amerifirst Funding Inc.,* No. 3:07-cv-01188, 2008 WL 919546, at *2 (N.D. Tex. Mar. 11, 2008; *SEC v. Gallagher*, No. 3:19-cv-00575, 2020 WL 5993225, at *2 (N.D. Tex. Sep. 30, 2020)) This authority enables orderly liquidation of non-essential assets to generate funds for distribution to victims.

## I.  ESSENTIAL LIMITATIONS PROTECTING DUE PROCESS

The Fifth Circuit repeatedly emphasizes that receivership powers, while broad, are "not limitless." *Netsphere*, 703 F.3d at 306. Two fundamental boundaries constrain the receiver's authority. First, the court "may not reach a defendant's assets unrelated to the underlying litigation"

to preserve them for potential judgments. *Id*. at 305. The receiver's power extends only to property within the court's jurisdiction stemming from this dispute. Second, the Fifth Circuit requires that "parties whose rights may be impacted are entitled to notice and opportunity to be heard." *Stanford*, 927 F.3d at 851. The receivership "cannot permanently bar and extinguish" claims that are "wholly independent and unrelated to estate property." *Id*. These limitations ensure the receivership remains "necessary to protect the federal receivership" without exceeding constitutional bounds. *Id*.

### J. APPLICATION TO THE PRESENT EMERGENCY

Each element of the receiver's authority addresses specific aspects of HMA's catastrophic failure. The asset control powers prevent further dissipation of the $20 million in frozen customer funds. Operational authority enables immediate restoration of claims processing for customers facing medical emergencies. Litigation powers provide the mechanism to recover millions that the Gorogs admitted diverting from customer accounts. The stay authority prevents 10,000 victims from initiating destructive competing lawsuits that would deplete the estate through duplicative litigation costs.

Claims administration ensures fair and orderly distribution to all victims rather than a race to the courthouse benefiting only the swift. Coordination with the FBI bridges the gap between criminal prosecution, which cannot provide immediate civil relief, and civil recovery, which can restore customer access to their funds. Professional retention brings essential expertise to maximize recovery from a complex healthcare fraud. Asset liquidation authority enables conversion of any non-cash assets to funds available for distribution.

These powers, established through decades of Fifth Circuit precedent and grounded in Federal Rule of Civil Procedure 66, provide exactly the authority needed to address this

emergency. Without them, 10,000 victims remain helpless. With them, the receiver becomes this Court's instrument of equity, capable of providing immediate relief while pursuing maximum recovery.

## XIII. CONCLUSION: IMMEDIATE ACTION IS IMPERATIVE

The evidence is overwhelming. The law is clear. The need is urgent. The evidence shows Defendants confessed to running a Ponzi scheme, documented their "pocket the savings" fraud, and bragged about throwing claims "in the trash." The FBI confirmed it all by raiding their offices and shutting down operations. The law demands action through every applicable standard. Every *Netsphere* element is satisfied with clear necessity from FBI seizure, inadequate legal remedies that cannot access seized records, and benefits to thousands of victims exceeding any burden on confessed criminals. Every *Santibanez* factor supports receivership through valid claims proven by confession, admitted fraud documented in writing, imminent danger from complete operational collapse, no viable alternatives, and overwhelming public benefit.

Rule 66 provides clear authority. Section 3103 supplies additional guidance. Nationwide precedent mandates intervention. The need cannot be overstated. Diabetics need insulin today. Cancer patients need treatment Monday. Heart patients need medication now. Without a receiver, they get nothing. Every hour matters. Every day reduces recovery. Every moment of delay causes concrete, irreversible harm to vulnerable Americans who trusted Defendants with their healthcare savings. This Court possesses both the power and the duty to act. The appointment of a receiver is not merely appropriate or advisable—it is essential and urgent. The Court must act immediately. Today. Because for some victims, tomorrow will be too late.

WHEREFORE, Plaintiffs respectfully request that the Court enter the attached order appointing Nick Foley as Receiver.

Dated:  October 28, 2025                    Respectfully submitted,

.

*Alexander Loftus*

ALEXANDER LOFTUS, Esq.
Attorney-in-Charge
SDTX Federal No. 3663102
**LOFTUS & EISENBERG, LTD.**
181 W Madison, Suite 4700
Chicago, Illinois 60602
Ph: 312.899.6625
alex@loftusandeisenberg.com

*- and -*

JAMES CREWSE, Esq.
Texas Bar No. 24045722
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph:  214.394.2856
jcrewse@crewselawfirm.com

**ATTORNEYS FOR PLAINTIFFS**
**AND THE PROPOSED CLASSES**

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1, undersigned counsel certifies that he conferred with counsel for HMA and counsel is opposed.

*Alexander Loftus*