# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BOBBIE POPE, ET AL., | § | |
| *on behalf of themselves and others* | § | |
| *similarly situated*, | § | |
| | § | NO: 4:24-cv-04611 |
| *Plaintiffs*, | § | Judge Ellison |
| | § | |
| v. | § | |
| | § | |
| HEALTH MATCHING | § | |
| ACCOUNT SERVICES, INC., | § | |
| | § | JURY TRIAL DEMANDED |
| *Defendant*. | § | |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO APPOINT RECEIVER

On October 28, 2025, at approximately 5:00 PM, the undersigned counsel received the unsealed Temporary Restraining Order entered against Health Matching Account Services, Inc. ("HMA") in *United States v. Health Matching Account Services, Inc.*, No. 4:25-cv-00814-RK (W.D. Mo. Oct. 22, 2025)(Attached hereto as Exhibit "A"). This supplemental memorandum addresses how the criminal TRO affects—and indeed necessitates—the receivership sought in Plaintiffs' emergency motion.

This supplemental memorandum demonstrates four critical points based on what was received last night: (1) the TRO does not and cannot bind a court-appointed receiver; (2) the receiver provides essential relief unavailable under the TRO; (3) the TRO and receivership function cooperatively through established coordination mechanisms; and (4) a freeze without remedial apparatus leaves victims worse off than before. In sum, the TRO proves the point and sets the stage for a Receiver to get to work for the victims.

## I.     THE TRO DOES NOT BIND THE RECEIVER

The Western District of Missouri's TRO binds "Defendants, their agents (including financial and banking institutions or any other entities having possession or control of Defendants' assets), officers, and employees, and all other persons or entities in active concert or participating with Defendants in their affairs." TRO at 2 (ECF No. 3, W.D. Mo.). The TRO does not mention a receiver and therefore does not, by its express terms, reach an officer of this Court later installed under Federal Rule of Civil Procedure 66.

### A.  The Governing Legal Framework

Rule 65(d)(2) limits any injunction's reach to (1) the parties; (2) their "officers, agents, servants, employees, and attorneys," and (3) anyone "in active concert or participation" with them who has notice. Fed. R. Civ. P. 65(d)(2). A court-appointed receiver is none of these. A receiver is an agent solely of the appointing court, not an agent of the defendant corporation. *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980); *see also Eller Indus., Inc. v. Indian Motorcycle Mfg., Inc.*, 929 F. Supp. 369, 374-75 (D. Colo. 1995) (pre-existing injunction "cannot bind this Court" or its receiver).

The Fifth Circuit has repeatedly held that a receiver "stands in the shoes" of the receivership entity but derives authority solely from the appointing court. *SEC v. Stanford Int'l Bank, Ltd.*, 927 F.3d 830, 841 (5th Cir. 2019). The receiver's duties run to the court and to victims—not to defendants whose misconduct necessitated appointment.

### B.  Exclusive Control of the Receivership Court

Once a receiver is appointed, the appointing court acquires exclusive *in rem* jurisdiction over the receivership estate and may bar any other forum from interfering with that property. *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). Outside orders—even those of

another federal court—cannot dictate how the receiver manages estate assets without leave of the receivership court. *Eller Indus.*, 929 F. Supp. at 374-75.

Plaintiffs' memorandum documents that approximately $20 million in customer deposits, matching-fund "credits," and related digital records constitute the receivership res. Pls.' Mem. 6–7, 13 (ECF 61-1). By operation of 28 U.S.C. § 754 and the proposed order of appointment (attached as Exhibit B), this Court will acquire exclusive jurisdiction over every asset, claim, and record of the frozen estate, wherever located. Any party seeking to restrain or control that property—including the United States in the criminal action—must obtain leave of this Court.

### C. Two Distinct but Complementary Forms of Federal Relief

The current posture presents a textbook scenario for deploying both instruments of federal fraud enforcement: the criminal TRO under 18 U.S.C. § 1345 has frozen assets, and now a civil equity receivership must marshal, liquidate, and distribute those assets to victims.

#### 1. Section 1345: A Preservation Statute with Inherent Limitations

The TRO derives from 18 U.S.C. § 1345, which authorizes the Attorney General to obtain injunctive relief barring "withdrawing, transferring, removing, dissipating, or disposing" of fraud proceeds and permits appointment of a "temporary receiver to administer such restraining order." 18 U.S.C. § 1345(a)(2)(B)(i)–(ii). Courts recognize this relief is "provisional" and designed merely "The asset freeze was imposed to preserve the Defendants' assets for restitution and forfeiture if the related criminal actions resulted in convictions." *United States v. Petters*, No. 0:08-cv-05348, at *2–3 (D. Minn. Nov. 16, 2010)

Section 1345 provides four tools: prospective injunction halting further fraud (*United States v. William Savran & Assocs., Inc.*, 755 F. Supp. 1165, 1169 (E.D.N.Y. 1991)); immediate asset freeze of commingled accounts (*id.*); restraint of substitute assets when direct tracing fails (*Petters*); and

3

appointment of a custodial receiver limited to holding frozen property (*United States v. Hague-Rogers*, No. 3:11-cv-00792 at 8 (N.D. Tex. Jul. 7, 2011)). The TRO here employs the first three tools but appoints no receiver at all.

Moreover, § 1345 freezes must be proportional and limited to tainted assets. *United States v. Brown*, 988 F.2d 658, 661 (6th Cir. 1993). These limitations serve due process but leave victims without recourse: if the government releases funds for defendants' expenses, where do victims obtain funds for insulin and chemotherapy?

### 2.  Federal Equity Receivership: Comprehensive Estate Administration

Federal equity receiverships provide remedial authority vastly exceeding § 1345's custodial role: (1) **Claw-back of fraudulent transfers.** The Fifth Circuit permits receivers to sue under state Uniform Fraudulent Transfer Acts, holding that proving that a transferor operated as a Ponzi scheme establishes fraudulent intent. *Janvey v. Alguire,* 647 F.3d 585, 598 (5th Cir. 2010).  Gorog instructed staff to "stiff the hospital and wipe out the HMA account balances" while "pocketing the savings." Pls.' Mem. 7-8, 12-13. Only a receiver can bring TUFTA claims to recover these diverted millions. (2) **Recovery of fictitious profits.** District courts hold that "[a]n investor in a Ponzi scheme does not exchange reasonably equivalent value for payments which exceed the investor's investment." *Miller v. Wulf*, 84 F. Supp. 3d 1266, 1275 (D. Utah 2015). Holly Shelton testified matching funds were "phantom numbers" with "no money actually associated." Pls.' Mem. 12. Customers who received payments exceeding actual deposits may have received fictitious profits the receiver can recover and redistribute. (3) **Imposition of constructive trusts and turnover orders.** The $20 million in frozen customer deposits represents a commingled pool where tracing individual deposits is impossible. Only a receiver with equitable authority can unwind these funds and impose constructive trusts ensuring recovered assets benefit all victims

proportionally. (4) **Operation or wind-down of businesses and asset sales.** The Eighth Circuit upheld receiver authority to operate businesses, sell assets, and file bankruptcy petitions to maximize recoveries. *United States v. Ritchie Special Credit Invs., Ltd.*, 2010 U.S. App. LEXIS 18408, at *7-8 (8th Cir. 2010). HMA's digital claims platform, customer database, and healthcare provider relationships may have value if properly administered. A receiver could potentially sell these assets to a legitimate administrator, generating additional funds for distribution. (5) **Creation of court-approved distribution plans and claims adjudication.** The Eleventh Circuit requires receivers to provide due process but upholds summary claim-adjudication procedures. *SEC v. Torchia*, 922 F.3d 1307, 1316-19 (11th Cir. 2019). HMA has approximately 10,000 victims with claims totaling $20 million or more. Only a receiver can establish the claims process necessary to evaluate, prioritize, and pay these claims equitably.

Critically, receivership power has defined boundaries protecting due process. A receiver may assert only claims of entities in receivership, not personal claims of investors. *Klein v. Cornelius,* 786 F.3d 1310 (10th Cir. 2015). Transfers given in good faith for reasonably equivalent value remain protected. *Janvey v. Brown*, 767 F.3d 430, 435 (5th Cir. 2014).

### 3. The Petters Template: Sequential Deployment of Both Instruments

The $3.5 billion Petters fraud exemplifies proper two-step approach: "a § 1345 injunction secured the assets, and the receiver, operating under separate equitable authority, pursued claw-backs and structured distributions." *Petters*, No. 0:08-cv-05348; *Ritchie Special Credit*, 2010 U.S. App. LEXIS 18408. The Minnesota district court first entered a § 1345 TRO freezing all assets. Then, in parallel civil proceedings, it appointed an equity receiver who spent years recovering diverted assets and distributing over $1 billion to victims.

The first step is complete: the Western District of Missouri's TRO has frozen HMA's accounts. Now this Court must complete the second step by appointing an equity receiver to administer the frozen estate for victim benefit.

### 4. Why Waiting for Criminal Resolution Is Unacceptable

Criminal cases take years. *Petters* took over five years from indictment to final sentencing, and the receiver began distributions years before criminal restitution became available. HMA's victims need insulin today, not in 2028. Criminal restitution depends on defendants' ability to pay. If the Gorogs hide assets offshore, die, or file bankruptcy, criminal restitution may be uncollectable. The receiver's fraudulent transfer litigation can recover assets criminal forfeiture cannot reach.

Criminal restitution does not include a claims process. The government lacks resources and expertise to establish victim eligibility, claim amounts, and distribution priorities. The federal shutdown has furloughed 34% of U.S. Attorney staff. Pls.' Mem. 19-20. The receiver has the mandate and expertise to establish this process.

The TRO has not stopped the fraud. The October 27 Koppin charge proves passive criminal restraints cannot protect victims from ongoing harm. *See Supra* Only active management by a receiver can identify and stop unauthorized charges, reverse fraudulent debits, and implement proper controls.

## II. THE RECEIVER PROVIDES ESSENTIAL RELIEF UNAVAILABLE UNDER THE TRO

The criminal TRO freezes bank accounts and preserves evidence but provides no mechanism for victim relief. The receiver fills this critical gap.

### A. The TRO Offers No Mechanism for Claims Processing

The TRO restrains HMA from "cashing any checks or depositing or processing any payments from HMAS and PHMA members" and prohibits "accessing" bank accounts. TRO ¶¶ 3-4. These

prohibitions prevent dissipation but leave 10,000 victims in limbo. Plaintiffs' memorandum details urgent healthcare needs: diabetics need insulin, cancer patients require chemotherapy, heart patients depend on cardiac medications. Pls.' Mem. 11-12. The TRO authorizes no one to process these emergency medical claims. The government has no mandate to do so, and the federal shutdown has furloughed civil enforcement personnel.

Only a receiver appointed by this Court can immediately begin processing legitimate claims. The proposed order (Exhibit B) authorizes the receiver to "take immediate control of HMA's operations, assets, books and records" and to "continue operation of the business or wind down operations as the Receiver deems appropriate." Proposed Order ¶¶ 3, 6. This includes establishing streamlined claims processes, evaluating emergency medical needs, coordinating with healthcare providers, and prioritizing life-saving treatments. Courts recognize healthcare-related emergencies justify extraordinary equitable relief. *See Capital Fin., LLC v. 22 Maple St., LLC*, 295 F. Supp. 3d 19, 27 (D.D.C. 2018).

### B.  The TRO Cannot Preserve Digital Infrastructure

The TRO prohibits "destroying or otherwise discarding any records (including electronically stored information)." TRO ¶ 8. This protects against intentional destruction but does nothing to prevent inevitable corruption when digital systems sit unmaintained. HMA's electronic claims platform contains millions of claim records and at least 10,000 customer accounts. Pls.' Mem. 6-9. Without active administration, databases corrupt, servers crash, and backups fail.

The proposed order authorizes the receiver to "take possession of all property, assets, and estates of every kind of HMA" including "electronically stored information, computers, and computer systems." Proposed Order ¶ 4. The receiver can coordinate with the FBI to access seized systems while preserving chain of custody, implement immediate data backup protocols, hire IT

professionals to maintain critical infrastructure, and reconstruct customer account records before digital decay makes recovery impossible.

The alternative—allowing critical digital infrastructure to decay while waiting for criminal resolution—guarantees catastrophic loss. A passive freeze is not preservation; it is destruction in slow motion.

### C. The TRO Cannot Marshal Assets or Pursue Recoveries

The TRO freezes HMA's bank accounts but does not marshal assets or pursue fraudulent transfers. Gorog bragged about "pocket[ing] the savings" and instructed staff to "stiff the hospital and wipe out the HMA account balances." Pls.' Mem. 7-8, 12-13. These admissions confirm millions were diverted from the frozen accounts.

The proposed order authorizes the receiver to "institute, prosecute, compromise, adjust, intervene in or become party to such actions or proceedings … as the Receiver deems necessary and advisable." Proposed Order ¶ 9. This includes bringing claw-back claims against insiders who received transfers while HMA was insolvent, tracing and recovering assets transferred to offshore accounts, voiding preferential payments, and pursuing alter ego claims against related entities.

The Fifth Circuit has held that receivers have standing to bring fraudulent transfer claims the debtor entity could have brought. *Janvey v. Alguire*, 647 F.3d 585, 595-96 (5th Cir. 2011). These recovery actions will take months or years. Every day of delay means colder trails and reduced recoveries.

It is telling that the alleged fraudsters prefer only the TRO without a Receivership.

## III.   THE TRO AND RECEIVERSHIP FUNCTION COOPERATIVELY

Federal courts recognize criminal restraints and civil receiverships serve complementary purposes when properly coordinated. A court-appointed fiduciary is the natural bridge between parallel civil and criminal proceedings. *See United States v. Setser,* 2009 U.S. App. LEXIS 10199, at *9–10 (5th Cir. 2009); *United States v. Petters*, No. 0:08-cv-05348 (D. Minn. Jul 1, 2009); *Herzfeld v. United States District Court*, 699 F.2d 503, 505–06 (10th Cir. 1983).

### A. Coordination Mechanisms in the Proposed Order

The proposed order contains specific provisions ensuring cooperation between the receivership and criminal proceedings: (1) **Preservation of criminal evidence.** The receiver must "preserve all books, records, accounts, and other documents" and "maintain strict chain of custody protocols for all evidence that may be relevant to criminal proceedings." Proposed Order ¶ 19. (2) **Coordination with law enforcement.** The receiver is authorized and directed to "coordinate and cooperate with federal law enforcement agencies, including the Federal Bureau of Investigation and the United States Attorney's Office." Proposed Order ¶ 20. (3) **Notice to the United States.** Before taking any action that might implicate the TRO's prohibitions, the receiver must "provide reasonable advance notice to the United States Attorney's Office for the Western District of Missouri." Proposed Order ¶ 21. (4) **Resolution of conflicts.** If conflicts arise between the TRO and receivership operations, the proposed order provides that "either party may seek clarification or modification from this Court, and this Court will coordinate with the Western District of Missouri as appropriate." Proposed Order ¶ 22. These mechanisms ensure operational harmony while respecting both courts' prerogatives.

## B. Complementary Relief Without Conflict

The receiver's core functions—processing victim claims, maintaining digital systems, and pursuing fraudulent transfers—do not require violating any TRO prohibition. The receiver will not help defendants cash checks, solicit new members, or destroy evidence. The receiver will do what the TRO cannot: actively administer a paralyzed estate for victim benefit.

Should operational conflict arise—for example, if the receiver must temporarily access a frozen account to process legitimate medical claims—the proposed order's coordination mechanisms provide the solution. The receiver will move this Court for specific authority and provide notice to the United States. If the government objects, both courts can coordinate to resolve the conflict. This approach respects both courts' prerogatives while ensuring operational necessities do not founder on technical conflicts.

## C. The Proposed Receiver's Experience

Plaintiffs' proposed receiver, Nick Foley of Trinity River Advisors, has extensive experience coordinating with federal law enforcement. His firm is "frequently engaged by the Department of Justice to act as Receiver in cases involving fraud prosecutions." Pls.' Mem. 17. His counsel, Terence Banich, currently serves as principal attorney for a federal equity receiver in the largest Ponzi scheme case in the Central District of California. *Id.* at 16-17.

The receiver will access seized records while preserving them for prosecution, process victim claims while maintaining evidence integrity, pursue asset recovery while coordinating with criminal forfeiture, and ensure civil restitution complements criminal penalties. The receiver can also serve as a single point of contact for thousands of victims, reducing burden on both the DOJ and this Court.

### IV.    A FREEZE WITHOUT REMEDY LEAVES VICTIMS WORSE OFF

The most compelling reason for immediate receivership is that the TRO, standing alone, has created a humanitarian crisis. The freeze prevents victims from accessing their healthcare funds at the moment they need them most. And the TRO has failed to stop ongoing fraud.

### A.  Victims Continue to Be Charged After the TRO

The TRO was entered October 22, 2025, and prohibits HMA from "cashing any checks or depositing or processing any payments from HMAS and PHMA members." TRO ¶ 3. Yet as of October 27, 2025—**five days after the TRO**—victims were still being debited. Exhibit C shows Theresa Koppin's bank statement with two transactions on October 27, 2025: Check #7372 for -$1,000.00 and "Hma Services Service St G M U" for **-$319.00**. The statement specifically identifies the charge as occurring on **10/27/2025** with notation "HMA SERVICES HMA SERVIC ST-C2G9M6U2F5T2."

This ongoing fraud demonstrates the fundamental inadequacy of the TRO as sole remedy. The government's restraining order has frozen HMA's accounts, shut down its websites, and preserved its records—but it has **not stopped systematic theft from victims' bank accounts**.
Without a receiver who can immediately take control of HMA's payment processing systems, identify all unauthorized post-TRO charges, coordinate with financial institutions to reverse fraudulent debits, implement proper financial controls, contact all victims to instruct them to cancel automatic payments, and work with payment processors to shut down all remaining channels, victims will continue suffering harm.

The TRO was supposed to prevent HMA from "processing any payments." Yet five days later, HMA processed a $319.00 payment from Theresa Koppin. This failure proves passive criminal restraints cannot protect victims. Active management by a court-appointed receiver is

essential. The proposed order specifically authorizes the receiver to "immediately cease all unauthorized withdrawals, debits, or charges to customer accounts" and to "implement controls preventing any further unauthorized access to customer funds." Proposed Order ¶ 7.

## B. Healthcare Emergencies Cannot Wait

Plaintiffs' memorandum documents specific healthcare emergencies. Pls.' Mem. 11-12. These are present emergencies requiring immediate intervention. The Koppin bank statement itself tells the story: on October 27, the same day HMA fraudulently debited $319.00, Koppin withdrew $1,000.00—likely to pay medical expenses HMA should have covered.

The federal government shutdown exacerbates this crisis. The DOJ's FY 2026 Contingency Plan confirms "Civil litigation will be curtailed or postponed to the extent that this can be done without compromising to a significant degree the safety of human life or the protection of property." Pls.' Mem. 19-22. While the FBI's criminal investigation continues, civil recovery for fraud victims falls into curtailed litigation. The government has furloughed 34% of U.S. Attorney staff and 42% of Civil Division attorneys. *Id.*

The result: 10,000 victims trapped in bureaucratic limbo. The FBI has seized HMA's records as part of its criminal function, but civil attorneys who could help victims recover are furloughed, and criminal prosecutors cannot provide civil restitution. A private receiver appointed by this Court faces no such restrictions.

## C. Passive Preservation Guarantees Asset Destruction

The Fifth Circuit recognized government freezes can accelerate asset waste if no fiduciary is installed to manage day-to-day affairs. In *Janvey v. Alguire*, the district court concluded "dissipation of the assets … would impair the Court's ability to grant an effective remedy," and appointed a receiver notwithstanding an existing injunction. 647 F.3d 585, 599-600 (5th Cir.

2011). The Northern District of Texas quantified this principle: "as defendant continues to liquidate, transfer, and encumber assets, there is an imminent danger that property will be concealed, lost, or diminish in value." *World Fuel Services Corp. v. Moorehead*, 229 F. Supp. 2d 584, 589 (N.D. Tex. 2002). Only active management by a court-appointed receiver can prevent these harms. The proposed order authorizes the receiver to "retain employees, consultants, or independent contractors as the Receiver deems necessary," "maintain insurance coverage," and "take all actions necessary to preserve the value of the receivership estate." Proposed Order ¶¶ 11, 13, 15.

Criminal prosecutions take years. Discovery, motion practice, trial, sentencing, and appeals will extend well into 2026 or beyond. Victims cannot wait that long. Assets cannot remain frozen that long without catastrophic decay. The equity power to appoint a receiver exists precisely for situations like this, where legal remedies are inadequate and immediate action is necessary to prevent irreparable harm.

WHEREFORE, Plaintiffs respectfully request that this Court immediately appoint a receiver over HMA and its assets, grant the receiver all powers necessary to preserve assets and process emergency medical claims, stay all competing litigation, and grant such other relief as the Court deems just and proper. A proposed order is submitted herewith.

Dated:  October 29, 2025                          Respectfully submitted,

.

By:

ALEXANDER LOFTUS, Esq.
Attorney-in-Charge
SDTX Federal No. 3663102
**LOFTUS & EISENBERG, LTD.**
181 W Madison, Suite 4700
Chicago, Illinois 60602
Ph: 312.899.6625
alex@loftusandeisenberg.com

*- and -*

JAMES CREWSE, Esq.
Texas Bar No. 24045722
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph:  214.394.2856
jcrewse@crewselawfirm.com
**ATTORNEYS FOR PLAINTIFFS
AND THE PROPOSED CLASSES**

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule 7.1, undersigned counsel certifies that Plaintiffs' Counsel did not confer with Defendant on this supplemental filing. It is an emergency on an emergency.

*Alexander Loftus*

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this motion has been served on all counsel of record through the Court's CM/ECF system on October 29, 2025.

*Alexander Loftus*

# EXHIBIT "A"

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-00814-RK |
| | ) | |
| HEALTH MATCHING ACCOUNT | ) | |
| SERVICES, INC., PET HEALTH | ) | |
| MATCHING SERVICES, INC., REGINA | ) | |
| GOROG, A/K/A REGINA BARGANIER; | ) | |
| AND ELLIOTT GOROG, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

On October 17, 2025, the United States filed this consumer fraud action against Defendants Health Matching Account Services, Inc. ("HMAS"), Pet Health Matching Services, Inc. ("PHMS"), Regina Gorog, and Elliott Gorog under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345. (Doc. 1.) Now before the Court are two motions: (1) an *ex parte* motion to file the case under seal, (Doc. 2), and (2) an *ex parte* emergency motion for temporary restraining order and injunctive relief, (Doc. 3).

### I.  *Ex Parte* Motion to Proceed Under Seal (Doc. 2)

After careful consideration and review, and for good cause shown, the Court **ORDERS** that the United States' *ex parte* motion to file the case under seal is **GRANTED**. This case shall accordingly remained under seal until a named Defendant is served with the initial pleadings. Nothing in this Order precludes the United States or law enforcement officers involved from serving notice of any TRO entered in this case upon affected third parties, including financial institutions and web hosting companies.

### II.  *Ex Parte* Motion for Temporary Restraining Order and Injunctive Relief (Doc. 3)

Having considered the United States' *ex parte* motion for temporary restraining order and injunctive relief and the verified complaint, the Court finds that the United States has made a sufficient showing in support of the emergency injunctive relief granted herein as required by Rule 65(b) of the Federal Rules of Civil Procedure and 18 U.S.C. § 1345, the Anti-Fraud Injunction Statute. The Court finds, based on the verified complaint and *ex parte* motion, that absent

emergency injunctive relief, Defendants will both continue to solicit new members who will begin to make new contributions to the fraudulent healthcare savings plan-like programs and will continue to collect contributions by existing members and may then dissipate, alienate, and conceal the proceeds of the fraudulent scheme. In short, the Court is satisfied that emergency injunctive relief without prior notice to Defendants is necessary to protect the public interest as expressly authorized by the Anti-Fraud Injunction Statute and is consistent with Rule 65(b). Pursuant to Federal Rule of Civil Procedure 65(c), no security is required of the United States for issuance of this Temporary Restraining Order.

Accordingly, the Court **ORDERS** that Defendants, their agents (including financial and banking institutions or any other entities having possession or control of Defendants' assets), officers, and employees, and all other persons or entities in active concert or participating with Defendants in their affairs are hereby temporarily enjoined and restrained from:

(1) maintaining, using, and doing business through the use of the domains "healthmatchingaccounts.com" and "healthmatching.com";

(2) soliciting or enrolling new HMAS and PHMA customers/members;

(3) cashing any checks or depositing or processing any payments from HMAS and PHMA members;

(4) accessing the following accounts (including but not limited to, accepting deposits, processing payments, depositing, transferring, withdrawing, pledging, encumbering, disposing of, or otherwise using funds held in the accounts):

      PlainsCapital Account No. █████ 8956
      PlainsCapital Account No. █████ 9102
      PlainsCapital Account No. █████ 8901
      PlainsCapital Account No. █████ 3400
      PlainsCapital Account No. █████ 7802
      PlainsCapital Account No. █████ 7102
      PlainsCapital Account No. █████ 1703
      PlainsCapital Account No. █████ 3302
      PlainsCapital Account No. █████ 3902
      Stripe Account ID: acct_█████ vejH
      Stripe Account ID: acct_█████ rp2t
      Stripe Account ID: acct_█████ UYzw

(5) establishing any new bank accounts without informing the government in advance;

(6) dissipating, transferring, selling, withdrawing, pledging, encumbering, disposing of, or otherwise using, any personal or business assets that were derived or obtained from HMAS

and PHMA-related activities, or that are co-mingled with money or other assets derived or obtained from HMAS and PHMA-related activities;

(7) opening or attempting to open safe deposit boxes and/or safes into which proceeds of HMAS and PHMA-related activities are deposited, transferred or placed; and

(8) destroying or otherwise discarding any records (including electronically stored information), relating to the business of HMAS and PHMA, including but not limited to business, corporate, banking, financial, and accounting records.

The Court **FURTHER ORDERS** that GoDaddy.com and Verisign, Inc. shall take such steps as are necessary to prevent the public from accessing Defendants' websites—(1) "healthmatchingaccounts.com" and (2) "healthmatching.com"—including by changing the Domain Name System record to remove any named server and leave it blank. GoDaddy.com and Verisign, Inc. shall impose a registry lock on the "healthmatchingaccounts.com" and "healthmatching.com" domain name and lock any accounts associated with the registrant of the domain name to prevent any change, transfer, or deletion of such domain name or accounts without the prior authorization of this Court.

The Court **FURTHER ORDERS** that within ten (10) business days of notice of this Order, Defendants must provide to the United States a sworn statement that (1) identifies each account or asset titled in the name of any named Defendants; (2) states the balance of each account or provides a description of the nature and value of each asset under the name of any named Defendant; and (3) identifies any safe deposit box or storage facility that is titled in the name of—or subject to access by—any named Defendant.

The United States shall execute service of this Order—along with copies of the Summons, Complaint, and *Ex Parte* Motion for Temporary Restraining Order and Injunctive Relief—on or before October 31, 2025. This temporary restraining order shall remain in force until November 5, 2025. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, Defendants shall appear before this Court on November 19, 2025, at 3:30 PM for a hearing to show cause why the preliminary injunction requested by the United States should not be granted.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: October 22, 2025

# EXHIBIT "B"

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| BOBBIE POPE, ET AL., | § | |
| *on behalf of themselves and others* | § | |
| *similarly situated*, | § | |
| | § | NO: 4:24-cv-04611 |
| *Plaintiffs*, | § | Judge Ellison |
| | § | |
| v. | § | |
| | § | |
| HEALTH MATCHING | § | |
| ACCOUNT SERVICES, INC., | § | |
| | § | JURY TRIAL DEMANDED |
| *Defendant*. | § | |

### ORDER APPOINTING RECEIVER AND PROVIDING RELATED RELIEF

THIS CAUSE coming before the Court on Plaintiffs' Emergency Motion to Appoint Receiver, dated October 28, 2025 (the "Motion"). The Court, having reviewed the Motion, the Memorandum in Support of the Motion, the First Amended Complaint and declarations in support of the Motion, and being fully advised of the Temporary Restraining Order entered by the United States District Court for the Western District of Missouri on October 22, 2025 in *United States v. Health Matching Account Services, Inc., et al.*, Case No. 4:25-cv-00814-RK (the "Missouri TRO"), hereby makes the following findings of fact, conclusions of law and order:

## Findings of Fact

a.      Defendant Health Matching Account Services, Inc. ("HMA" or "Defendant") purported to operate as a legitimate healthcare account administrator offering employer-sponsored health benefit plans.

b.      HMA promised to provide "Unrestricted Health Matching Accounts" where HMA would match customer contributions dollar-for-dollar, allowing customers to build healthcare savings for medical expenses.

c.      HMA operated nationwide with approximately 30,000 customers who collectively deposited millions of dollars into their healthcare accounts. Customers were required to make

monthly contributions ranging from hundreds to thousands of dollars, with HMA promising to match these contributions and use the combined funds to pay medical claims.

d.     A former HMA employee provided detailed statements confirming that the matching funds that HMA promised to customers "technically doesn't exist" and were merely "phantom" numbers in a computer system, and that customer accounts were "slush accounts" with no segregated funds and that HMA employees were instructed to lie to customers about claim payment status.

e.     On October 17, 2025, the United States filed a consumer fraud action against HMA and related defendants under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, in the Western District of Missouri.

f.     On October 22, 2025, the Western District of Missouri entered the Missouri TRO, which, *inter alia*: (i) froze HMA's bank accounts; (ii) prohibited HMA from doing business, soliciting new customers, or accessing frozen accounts; (iii) ordered domain registrars to take down HMA's websites; and (iv) preserved all business records.

g.     On October 23, 2025, the FBI executed search warrants at HMA's offices. The FBI seized HMA's business records and shut down all of HMA's operations.

h.     Approximately 10,000 customers cannot access their healthcare savings accounts. They cannot submit medical claims. They cannot obtain their funds for medications, treatments or procedures.

i.     HMA and its principal, Elliot Gorog ("Gorog"), have admitted that they have engaged in fraudulent conduct. For example: (1) Gorog stated: "It's my Ponzi scheme I can do what I want"; (2) Gorog described the fraud as follows: "we're going to charge members account balances the unadjudicated amount and pocket the savings"; (3) Gorog destroyed claims: "I tossed at least 30 claims in the trash"; (4) Gorog instructed theft: "stiff the hospital and wipe out the HMA account balances"; and (5) Phil Burghardt confirmed: "All matching was phantom."

j.     The property of HMA's customers, who are members of the purported class, is in imminent danger because, among other reasons: HMA's operations have completely ceased; the FBI is now in possession of all (or substantially all) of HMA's business records; digital infrastructure degrades without maintenance; no mechanism exists to protect customer claims or customer property; and healthcare providers remain unpaid for services rendered.

k.     Fiscal appropriations for the federal government lapsed on October 1, 2025, which limits the Justice Department's ability to pursue civil recovery, as confirmed in its FY 2026

Contingency Plan which states, in pertinent part, "Civil litigation will be curtailed or postponed" in the event of a government shutdown.

l.       HMA has had due and sufficient notice of the Motion.

## Conclusions of Law

Based on the foregoing findings of fact, the Court concludes as a matter of law that:

a.       There is a clear necessity to protect property. Following *Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012), and *Janvey v. Alguire*, 647 F.3d 585, 599-600 (5th Cir. 2011), the Court concludes that dissipation of assets would impair any effective remedy. The FBI seizure and Missouri TRO created immediate danger to $20 million in customer funds, digital infrastructure and pending claims.

b.       Legal and less drastic remedies would be inadequate. Applying *SEC v. Timothy Barton*, 79 F.4th 573, No. 24-10004 (5th Cir. Apr. 17, 2025), the Court concludes no other remedy provides the active management these assets require. Money damages cannot access FBI-seized records, process medical claims or preserve digital infrastructure. Unlike *Capital Funding LLC v. TLTX Holdings LLC*, No. 2:20-cv-00005 (N.D. Tex. Jan. 17, 2020), HMA's operations have ceased and the FBI controls all of its assets.

c.       The benefits of a receivership outweigh its burdens. The Court concludes that protecting approximately 10,000 fraud victims vastly outweighs any burden on HMA who has admitted operating a fraudulent scheme. As in *CFTC v. TMTE, Inc.*, No. 3:20-cv-02910 (N.D. Tex. Sept. 30, 2020), protecting fraud victims outweighs any burden that a receivership would create.

d.       Plaintiffs have a valid claim for relief. They established fraud claims through HMA's own admissions. *See, e.g., Santibanez v. Wier McMahon & Co.*, 105 F.3d 234 (5th Cir. 1997).

e.       There is a probability of fraudulent conduct. HMA has admitted that it operated a Ponzi scheme.

f.       There is imminent danger. FBI's seizure and operational shutdown create immediate, ongoing harm to customers' accounts, claims and property.

g.       The risk of erroneous deprivation is minimal given HMA's written admissions discussed above, and this order provides meaningful post-deprivation procedures. *See, e.g., SEC v. Bryant*, No. 4:17-cv-00336 (E.D. Tex. Aug. 15, 2017); *Whatley v. Philo*, 817 F.2d 19, 21 (5th Cir. 1987).

# Order

Based on the foregoing findings of fact and conclusions of law, it is therefore **ORDERED** that:

1.      The Motion is **GRANTED**.

## I. APPOINTMENT OF THE RECEIVER

1.      Nick Foley, of Trinity River Advisors, LLC, is hereby appointed receiver ("Receiver") of Health Matching Account Services, Inc., a Texas corporation, and all assets and properties in Health Matching Account Services, Inc.'s possession, custody or control (collectively, the "Receivership Property"). The Court hereby confers powers on the Receiver to the fullest extent permissible under 28 U.S.C. § 754, Federal Rule of Civil Procedure 66 and its equitable powers.

2.      "Receivership Property" includes, without limitation, all of Defendant's right, title and interest in and to all assets and properties in Defendant's possession, custody, and/or control, of whatever kind and nature, including, without limitation, all (a) personal property, including bank accounts, brokerage accounts, deposit accounts, machinery, equipment, contracts, URL's, domain names and licenses, and all other personal property and assets of whatever type or description; (b) real property; (c) legal and equitable claims; and (d) proceeds and products of any of the above.

3.      The Receiver is and is deemed to be an officer of the Court and shall have immunity from personal liability as is afforded such officers under federal and/or Texas law, as applicable, including but not limited to, immunity from personal liability for acts or omissions undertaken as the Receiver within the scope of his authority as set forth herein or as otherwise defined by law or by statute.

4.      The Receiver may rely upon the established business practices and procedures of Defendant, the information provided and statements made by Defendant, its employees and agents as well as records located in Defendant's files or provided by other persons.

5.      The Receiver is not required to post a bond.

## II. POWERS AND DUTIES OF THE RECEIVER

1.      The Receiver displaces Defendant's incumbent directors and executive officers, including all members of its Board of Directors and committees or subcommittees thereof, and

is deemed to be Defendant's sole chief executive officer and the sole member of its Board of Directors.

2.      Without limiting the generality of the grant of power conferred in paragraph 2, the Receiver is specifically authorized and directed to:


a.      Assume full control of Defendant, and have the sole and exclusive power and authority to manage and direct the business and financial affairs of Defendant, including without limitation, the sole and exclusive authority to authorize Defendant to file a petition for relief under title 11 of the United States Code (the "Bankruptcy Code"), and in connection therewith, be and be deemed a debtor-in-possession. For the avoidance of doubt, no person other than the Receiver is authorized to seek relief under the Bankruptcy Code for the Defendant.

b.      Manage, operate and administer the Receivership Property and the business of Defendant, as the Receiver deems to be advisable or necessary, by performing all incidental acts associated therewith.

c.      Conduct an investigation of Defendant's assets, liabilities and transfers to third parties, creditors, insiders, equity holders and others;

d.      Wind-down the business of Defendant and sell, liquidate or otherwise dispose of the Receivership Property, as the Receiver deems to be advisable or necessary, by performing all incidental acts associated therewith.

e.      Remove, dismiss, retain or hire, as the Receiver deems necessary or advisable, any director, officer, employee, advisor, independent contractor or agent of Defendant.

f.      Take possession or control and use Defendant's existing bank accounts, whether in the name of Defendants or their agents, or otherwise take such actions as necessary to ensure the bank accounts are under the control of the Receiver and ensure Defendant does not have access to such accounts without consultation with the Receiver or establish any other bank accounts at any bank approved in writing by the Receiver as the depository of any funds which may come into the possession of the Receiver in connection with his administration of the receivership estate.

g.      Assume ownership of and control over the attorney-client privilege for Defendant.

h.      Take exclusive custody, control, and possession of all Receivership Property, wherever situated.

i.      Open, review, and divert mail and electronic transmissions (including electronic mail) directed to Defendant or its employees or other representatives pertaining to the Receivership Property, and instruct that all such mail and transmissions be delivered to the Receiver directly.

j.      Sue for, demand and collect, receive, take in possession, hold, and manage all Receivership Property, including, without limitation, claims to avoid and recover fraudulent transfers;

k.      Institute, pursue, and prosecute all claims and causes of action of whatever kind and nature that may now or hereafter exist as is necessary to carry out this order, and, if necessary, commence civil actions in any court of competent jurisdiction (including this Court, under its ancillary jurisdiction).

l.      Use any means necessary to take possession of and to secure all areas of the business premises of Defendant.

m.      Conserve, hold, and manage all Receivership Property, and perform all acts necessary or advisable to preserve the value of those assets, in order to prevent any irreparable loss, damage, or injury to consumers or to creditors of Defendant, including, but not limited to, obtaining an accounting of the assets and preventing transfer, withdrawal, or misapplication of assets.

n.      Enter into transactions, including the sale or lease of Receivership Property, in the ordinary course of Defendant's business.

o.      Market and sell any and all Receivership Property, in one or more sales, outside the ordinary course of business free and clear of all liens, claims, and encumbrances, with all liens, claims, and encumbrances attaching to the proceeds of sale, through public or private proceedings, in a commercially reasonable manner, provided that any such marketing or sale of Receivership Property is exempted from the private sale requirements of 28 U.S.C. § 2001(b).

p.      Maintain, enter into contracts and purchase insurance as advisable or necessary.

q.      Perform under Defendant's existing contracts, as the Receiver deems advisable.

r.      Reject Defendant's existing contracts, as the Receiver deems advisable.

s.      Choose, engage, and employ attorneys, accountants, appraisers, auctioneers or other professional persons, as the Receiver deems advisable or necessary.

t.      Choose, engage, and employ physicians, nurses or other medical professionals to evaluate claims.

u.      Make payments and disbursements from the receivership estate that are in the ordinary course of Defendant's business and/or are otherwise necessary or advisable for carrying out the directions of, or exercising the authority granted by, this order.

v.      Institute, appear in, intervene in, or become party to such actions or proceedings in state, federal or foreign courts that the Receiver deems necessary and advisable to preserve or

recover the Receivership Property or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this order.

w.     Issue subpoenas to obtain documents and records pertaining to the receivership, and conduct discovery in this action on behalf of the receivership estate.

x.     Settle or compromise claims by or against Defendant, the receivership estate and/or the Receivership Property.

y.     File reports with the Court on a periodic basis.

z.     Take possession of or, if needed, to recover (and the U.S. Postal Service and all courier or delivery services shall be directed to release to Receiver or its designees), all mail or packages addressed to Defendant.

aa.    Take any action necessary to ensure that all licenses in the name of Defendant required under federal, state or local law are maintained.

bb.    Prepare and file any tax returns as may be required by law.

cc.    Propose a claims process for members of the putative class and implement any plan of distribution authorized by the Court.

dd.    File or submit requests for instructions from the Court.


3.     The Receiver must, as soon as reasonably practicable: (a) make contact with the FBI to request access to Defendant's books, records and property in the FBI's possession; (b) establish an emergency customer hotline; (c) secure all of Defendant's digital infrastructure; and (d) copy customer databases.

4.     Any assets recovered by the Receiver are Receivership Property. The Receiver will deposit such assets in a receivership bank account and use them only as permitted by this order or a subsequent order of the Court.

5.     In addition to the powers and authority specifically enumerated in Part II of this order, the Receiver has such other powers and authority as are reasonably incident to the powers and authority of a federal equity receiver generally.


## III. COOPERATION WITH THE RECEIVER

1.     Defendant and its respective officers, agents, advisors, servants, employees and all other persons in active concert or participation with it who receive actual notice of this order by any reasonable means, whether acting directly or through any trust, corporation, subsidiary, division or other device, are hereby stayed, restrained and enjoined from directly or indirectly:

a.      Transacting any business of Defendant, except as directed by the Receiver.

b.      Destroying, secreting, defacing, transferring, or otherwise altering or disposing of any documents of Defendant, including, but not limited to, books, records, accounts, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations, electronically-stored records, or any other records of any kind or nature.

c.      Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any Receivership Property or any other assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, Defendant, or the Receiver.

d.      Excusing debts owed to Defendant.

e.      Failing to notify the Receiver of any asset, including accounts, of Defendant held in any name other than the name of Defendant, or by any person or entity other than Defendant, or failing to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such assets.

f.      Doing any act or refraining from any act whatsoever to interfere with the Receiver's taking custody, control, possession, or managing of the assets or documents subject to this receivership; or to harass or interfere with the Receiver in any way; or to interfere in any manner with the exclusive jurisdiction of this Court over the assets or documents of Defendant; or to refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

2.      Defendant and its officers, agents, advisors, servants, employees and all other persons in active concert or participation with any of them, who receive actual notice of this order by any reasonable means, whether acting directly or through any trust, corporation, subsidiary, division or other device, shall fully cooperate with and assist the Receiver by, without limitation:

g.      Providing any information to the Receiver that the Receiver deems necessary to exercising the authority and discharging the responsibilities of the Receiver under this order.

h.      Providing any password required to access any computer, electronic file, or telephonic data in any medium.

i.      Advising all persons who owe money to Defendant that all debts should be paid directly to the Receiver.

3.      Any insurance broker, agent, carrier or underwriter is specifically ordered to cooperate with Receiver by timely furnishing copies of all insurance policies and related information. Policies shall be endorsed by Defendant naming Receiver as Named Insured and Loss Payee effective the date of this order as appropriate to the type of coverage.

## IV. TURNOVER OF PROPERTY AND FUNDS TO RECEIVER

1.      Immediately upon service of this order upon them, or within such period as may be permitted by the Receiver, Defendant or any other person or entity shall turn over, transfer and deliver possession, custody, and control of the following to the Receiver:

a.      All Receivership Property, wherever located.

b.      All documents of Defendant, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers.

c.      All keys, codes, and passwords necessary to gain or to secure access to any assets or documents of Defendant, including, but not limited to, access to its business premises, means of communication, accounts, computer systems, mail boxes, or other property.

2.      All financial institutions, finance companies, commercial lending companies, credit card processing agents or agents providing electronic funds transfer services or automated clearing house processing, brokerage houses, escrow agents, money market or mutual funds, title companies, commodity futures merchants, commodity trading companies, precious metal dealers, trustees or other financial institutions or depositories of any kind which have possession, custody or control of any assets, funds or accounts in the name or for the benefit of Defendant must:

a.      Grant, forthwith, to the Receiver access to and control over such accounts, and add the Receiver as an authorized signatory on such accounts; and

b.      Cooperate with all reasonable requests of the Receiver relating to implementation of this order, including transferring funds at his direction and producing records related to the assets of Defendant.

3.       All persons and entities in possession of or using any of the assets of Defendant, whether pursuant to any contract, lease or other occupancy, operating, use or service arrangement or otherwise, obligated to make payments to Defendant, or otherwise indebted to Defendant, are hereby ordered to continue paying all amounts now due and owing, or hereafter becoming due, in the ordinary course, with such payment being made to Receiver.

4.       In the event any person or entity fails to deliver or transfer any Receivership Property or document or otherwise fails to comply with any provision of this order, the Receiver may file an *ex parte* declaration of non-compliance regarding the failure. Upon filing of the declaration, the Court may authorize, without additional process or demand, writs of possession or sequestration or other equitable writs requested by the Receiver.

## V. STAY OF ACTS AFFECTING RECEIVERSHIP PROPERTY

1.       Except by leave of this Court, during pendency of this receivership, Defendant and all other persons and entities be and hereby are stayed and enjoined from taking any action or omission to establish or enforce any claim, right or interest for, against, on behalf of, in, or in the name of, Defendant, any of their subsidiaries, affiliates, partnerships, assets, documents, any Receivership Property, or the Receiver or the Receiver's duly authorized agents acting in their capacities as such, including, but not limited to, the following actions:

a.       Commencing, prosecuting and/or continuing any civil action, bankruptcy case or other proceeding, except that such actions may be filed solely to toll any applicable statute of limitations.

b.       Accelerating the due date of any obligation or claimed obligation.

c.       Filing, perfecting or enforcing any lien or enforcing any judgment.

d.       Taking or attempting to take possession, custody, or control of any Receivership Property.

e.       Attempting to foreclose, forfeit, alter, or terminate any interest in any asset, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise.

f.       Refusing, altering, limiting, discontinuing service or terminating any rights conferred by or licenses granted under any contract or agreement to which Defendant is a party. For the avoidance of doubt, the filing of the Complaint and the appointment of the Receiver pursuant to this order does not grant any person a termination right regarding or result in a termination

of any agreement to which Defendant is a party and any such termination right or termination shall be deemed null and void and unenforceable.

g.     Setting off of any debt owing to Defendant that arose before the date of this order against any claim against Defendant.

h.     Executing, issuing, serving, or causing the execution, issuance or service of, any legal process, including, but not limited to, attachments, garnishments, subpoenas, writs of replevin, writs of execution, or any other form of process whether specified in this order or not.

i.     Doing any act or thing whatsoever to interfere with the Receiver taking custody, control, possession, or management of the Receivership Property or documents subject to this receivership, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of this Court over the assets or documents of Defendant.

j.     For the avoidance of doubt, no person other than the Receiver is authorized to seek any relief under the Bankruptcy Code for the Defendant.

2.     Notwithstanding paragraph 19, this order does not stay a government unit from commencing or continuing a criminal, civil or administrative action against Defendant to enforce its police or regulatory power.

3.     The Receiver is hereby directed to serve a copy of this order by any reasonable means on all known creditors of Defendant as well as on counsel for the parties in, and the judicial officers presiding over, all civil actions against Defendant, the pendency of which the Receiver is presently, or may subsequently become, aware.


## VI. PROFESSIONALS

1.     The Receiver is authorized to retain and employ his firm, Trinity River Advisors, LLC, to assist him in carrying out his powers and duties under this order.

2.     The Receiver is authorized to retain and employ Terence G. Banich and Katten Muchin Rosenman LLP ("Katten") as his general counsel, effective as of October 24, 2025. The terms of Katten's retention, compensation and expense reimbursement as stated in its standard retention agreement are warranted, reasonable and appropriate under the circumstances, and accordingly are approved.

3.     The Receiver may, in the ordinary course of business and without further order of the Court, use Receivership Property to pay any fees owed to, and reimburse any expenses incurred by, himself and Katten at each firm's then-current hourly rates. Each periodic report filed by

the Receiver must state the fees and expenses paid during the reporting period. The Receiver may file motions to approve his periodic reports and all acts, transactions and expenditures made during the reporting period.

## VII. COORDINATION WITH PARALLEL PROCEEDINGS

1.     The Court is aware that on October 22, 2025, the United States District Court for the Western District of Missouri entered a Temporary Restraining Order in *United States v. Health Matching Account Services, Inc., et al.*, Case No. 4:25-cv-00814-RK (the "Missouri TRO"), which restrains certain conduct by HMA and persons and entities in active concert or participation with HMA.

2.     The Receiver is an officer of this Court appointed under Federal Rule of Civil Procedure 66, not an officer, agent, servant, employee, or attorney of Defendant, and is not a person or entity "in active concert or participation" with Defendant within the meaning of Federal Rule of Civil Procedure 65(d)(2). Accordingly, the Missouri TRO does not, by its terms or by operation of Rule 65(d)(2), bind the Receiver.

3.     This Court assumes exclusive *in rem* and *quasi in rem* jurisdiction over all Receivership Property as of the Effective Date. The Receiver's authority to administer the receivership estate derives solely from this Court and is governed exclusively by orders of this Court.

4.     Nothing in the Missouri TRO shall be construed to limit or restrict the Receiver's authority under this Order or the Court's exclusive jurisdiction over the receivership estate. The Receiver may take any and all actions authorized by this Order, including but not limited to accessing bank accounts, managing domain names, conducting business operations as necessary to preserve and liquidate assets, and administering the estate for the benefit of defrauded customers.

5.     Out of comity with the Western District of Missouri and to facilitate coordination between parallel proceedings, the Receiver is encouraged—but not required—to:

a.     Notify the United States Attorney's Office for the Western District of Missouri of this appointment within a reasonable time;

b.     Coordinate with the United States Attorney's Office and FBI regarding access to business records and other investigative matters;

c.     Keep the United States Attorney's Office informed of significant actions taken in administering the receivership estate; and

d.      Administer the estate in a manner consistent with the asset-preservation goals of the Missouri TRO to the extent such administration does not conflict with the Receiver's duties under this Order or impede the effective administration of the receivership.

6.      Should any question arise regarding the Receiver's authority or the relationship between this receivership and the Missouri TRO, the Receiver may seek clarification or instruction from this Court. The Receiver shall not be required to seek approval from the Western District of Missouri or the United States Attorney's Office before exercising powers granted by this Order.

7.      All prior injunctions and restraining orders affecting Defendant remain in effect as to Defendant and those persons and entities bound thereby under Federal Rule of Civil Procedure 65(d)(2), except as modified by this Order with respect to the Receiver's administration of the receivership estate.

## VIII. GENERAL PROVISIONS

1.      This order shall have effect from October 28, 2025 at 5:00 p.m. Central Time (the "Effective Date"), and the Receiver is hereby deemed to have taken possession and exercised control of any and all of the Receivership Property as of that date and time.

2.      The Court assumes exclusive *in rem* and *quasi in rem* jurisdiction of all Receivership Property as of the Effective Date.

3.      This order applies to all persons and entities with actual notice of its entry.

4.      The Receiver may apply to the Court for other and further relief as he deems appropriate under the circumstances.

5.      The Court retains exclusive jurisdiction over all Receivership Property and any action filed against Receiver or any professionals retained by the Receiver based upon acts or omissions alleged to have been committed in their representative capacities.

**IT IS SO ORDERED.**

Date: _____

Time: _____


_____
Honorable Keith P. Ellison
United States District Judge

# EXHIBIT "C"

 **SouthState**

**Good Evening, THERESA KOPPIN**



# INTEREST CHECKING ▰▰▰▰

Last Updated: October 28, 2025 7:00 PM

### $2,227.20
Current Balance

**Transactions**   Details & Settings

🔍 Search transactions

| Date | Description | Amount |
|---|---|---|
| OCT 27 2025 ② | 🖃 Check #7372<br>Check | **– $1,000.00**<br>$2,227.20  ⋮ |
| OCT 27 2025 | Hma Services Service St G M U<br>Gas | **– $319.00**<br>$3,227.20  ⋮ |

Hma Services Service St G M U  ✎

**Statement Description:**
HMA SERVICES HMA SERVIC ST-C2G9M6U2F5T2

**Date:**
10/27/2025