# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BOBBIE POPE, ET AL., § | |
| *on behalf of themselves and others* § | |
| *similarly situated*, § | |
| § | NO: 4:24-cv-04611 |
| *Plaintiffs*, § | Judge Ellison |
| § | |
| v. § | |
| § | |
| HEALTH MATCHING § | |
| ACCOUNT SERVICES, INC., § | |
| § | JURY TRIAL DEMANDED |
| *Defendant.* § | |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF <u>EMERGENCY</u> MOTION TO APPOINT RECEIVER[1]

ALEXANDER LOFTUS, Esq.
**LOFTUS & EISENBERG, LTD.**
181 W Madison, Suite 4700
Chicago, Illinois 60602
Ph: 312.899.6625
alex@loftusandeisenberg.com

*- and -*

JAMES CREWSE, Esq.
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph: 214.394.2856
jcrewse@crewselawfirm.com

*ATTORNEYS FOR PLAINTIFFS
AND THE PROPOSED CLASS*

---

[1] This brief only addresses the portion of the United States Brief in Opposition of Appointment of a Receiver and Replies to HMA's Response as well. Plaintiff intends to address the other points in the DOJ's attempted intervention once the Emergency is resolved in separate briefing.

i

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | iii |
| I. INTRODUCTION | 1 |
| II. ARGUMENT | 2 |
| A. VICTIMS NEED IMMEDIATE HELP THAT NEITHER OPPONENT WILL PROVIDE | 2 |
| 1. 10,000 Victims Cannot Access Healthcare Funds | 2 |
| 2. Victims Have Already Waited Too Long | 3 |
| B. $37 MILLION IN VICTIM FUNDS MUST BE TRACED AND RECOVERED | 3 |
| 1. The Government Proves Over $37 Million Has Vanished | 3 |
| 2. Only a Receiver Can Trace and Recover the Missing Millions | 4 |
| 3. Even Partial Recovery Would Vastly Exceed the Passive Freeze | 5 |
| 4. The Largest Cost Is Losing $37 Million Permanently | 5 |
| C. HMA BELIEVES IT CAN DEFEAT THE CHARGES AND RESUME OPERATIONS—PROVING THE NECESSITY OF A NEUTRAL RECEIVER | 5 |
| 1. HMA Signals Its Intent to Contest Charges and Resume Operations | 5 |
| 2. HMA's Expectation of Beating the Government Is Precisely Why a Receiver Is Necessary | 6 |
| 3. Criminal Acquittal Would Not Vindicate HMA | 6 |
| 4. A Receiver Protects Victims Regardless of Criminal Outcomes | 7 |
| 5. The Government Cannot Protect Victims If HMA Prevails Criminally | 7 |
| D. HMA'S LEGAL ARGUMENTS REST ON INAPPOSITE CASES | 7 |
| 1. The "First-in-Time" Cases Do Not Apply—Missouri Never Took Custody | 7 |
| 2. Receivers Are Officers of This Court, Not Agents of HMA | 8 |
| 3. The "Extraordinary Remedy" Cases Underscore Rather Than Defeat Receivership | 9 |
| 4. Modern Precedent Confirms Receivership Is Essential Where TROs Cannot Stop Dissipation | 10 |
| 5. Federal Courts Appoint Receivers Before Judgment | 10 |
| 6. Proof of Fraud Is Not Required | 11 |
| 7. Plaintiffs Satisfy All Receivership Factors | 11 |
| E. THIS COURT HAS AUTHORITY TO COORDINATE WITH MISSOURI AND DIRECT TURNOVER | 12 |
| F. PLAINTIFF IS SEEKING TO RUN A PLAY FROM THE PETTERS PLAYBOOK | 13 |
| III. CONCLUSION | 14 |

## TABLE OF AUTHORITIES

| Authority | Page(s) |
|---|---|
| *American Bd. of Trade, Inc.*, 830 F.2d 431 (2d Cir. 1987) | 5 |
| *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314 (8th Cir. 1993) | 11, 12 |
| *Bryan v. Speakman*, 53 F.2d 463 (5th Cir. 1931) | 7 |
| *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837 (9th Cir. 2009) | 11 |
| *Citibank v. Nyland (CF8) Ltd.*, 839 F.2d 93 (2d Cir. 1988) | 8 |
| *FTC v. Productive Marketing, Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001) | 13 |
| *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019) | 3 |
| *Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2010) | 5, 10 |
| *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543 (6th Cir. 2006) | 8, 10 |
| *Mann Manufacturing, Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971) | 13 |
| *Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012) | 9, 11 |
| *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234 (5th Cir. 1997) | 12 |
| *SEC v. Forex Asset Mgmt.*, 242 F.3d 325 (5th Cir. 2001) | 13 |
| *SEC v. Stanford Int'l Bank*, 927 F.3d 830 (5th Cir. 2019) | 8 |
| *SEC v. Timothy Barton*, No. 24-10004 (5th Cir. Apr. 17, 2025) | 9, 10 |
| *SEC v. Wencke*, 622 F.2d 1363 (9th Cir. 1980) | 9, 10 |
| *Tanzer v. Huffines*, 408 F.2d 42 (3d Cir. 1969) | 11 |
| *The Rev. Andrew P. Jacobs v. Kenneth Deshetler, Superintendent of Insurance of the State of Ohio*, 465 F.2d 840 (6th Cir. 1972) | 8 |
| *United States v. Gold Star Med. Servs.*, 180 F.3d 1277 (11th Cir. 1999) | 1 |
| *Vederra Holdings LLC v. Global Equity Partners, LLC*, 2024 WL 3798220 (S.D. Tex. July 15, 2024) | 9 |
| *United States v. Petters*, No. 0:08-cv-05348 (D. Minn.) | 14 |

## I.  INTRODUCTION

The emergency remains acute and the victims in need of immediate intervention.

Two parties oppose Plaintiffs' emergency motion to appoint a receiver: the United States of America and Health Matching Account Services, Inc. Neither offers any solution for 10,000 victims who need access to their healthcare funds today. Neither proposes any mechanism to trace and recover the $37 million in member funds that have vanished or manage the log jam of competing claims by providers and victims. Both simply say: no receiver, and no alternative either.

The government's position contradicts the very statute it invokes. The Anti-Fraud Injunction Act, 18 U.S.C. § 1345(b), exists to prevent a continuing and substantial injury to any person or class of persons for whose protection the action is brought. Yet the United States urges this Court to deny any immediate vehicle for delivering relief to victims—siding, in effect, with the wrongdoers. As the Eleventh Circuit explains, § 1345 was designed so courts may freeze assets and have a temporary receiver appointed to administer the assets until a final judgment is reached. *United States v. Gold Star Med. Serv*s., 180 F.3d 1277, 1282 (11th Cir. 1999). The government's opposition is directly at odds with statutory victim protection.

The opposition arguments amount to opposing emergency surgery because it requires expensive specialists. Yes, cardiac surgery requires cardiac surgeons, anesthesiologists, and specialized equipment—but that does not make it unjustifiably expensive when the patient is having a heart attack. The "specialized professionals" both opponents decry are the only means to (1) help victims access medical care today, and (2) recover tens of millions in fraudulently transferred assets.

The government's own verified complaint reveals the magnitude: **over $37 million in victim funds have vanished**. On October 1, 2023, HMA reported member balances of $33,034,560 but had only $130,609—less than 1% of reported balances. (Gov't Verified Compl. ¶¶ 35-37). By February 2024, over $37 million had disappeared while Elliott Gorog called it "my Ponzi scheme," laughed about victims demanding payment, and used member funds for beachfront condos. (Id. ¶¶ 40, 42-46).

Most troubling, HMA's response suggests it might resume operations and signals its belief it can defeat the government's charges. (HMA Resp. at 20-22). A confessed Ponzi operator that looted $37 million, thinks it can beat federal charges, and wants to resume operations demonstrates exactly why a neutral receiver is essential.

## II.    ARGUMENT

### A. VICTIMS NEED IMMEDIATE HELP THAT NEITHER OPPONENT WILL PROVIDE

#### 1.    10,000 Victims Cannot Access Healthcare Funds

The government's freeze leaves 10,000 victims unable to access healthcare funds. Victims face immediate crises: diabetics need insulin today, cancer patients need chemotherapy this week, cardiac patients need medications now. Neither opponent offers any solution. The government points to a website where victims can "report losses to the FBI" (Gov't Br. at 13)—cold comfort to someone who needs medical care. HMA offers nothing. Both argue the Missouri TRO is "adequate" while victims ration insulin and delay chemotherapy and receiving collection calls from providers.

The key here is that HMA owed money to both providers and customers and this needs to be sorted out. Only a receiver can provide immediate relief by: establishing triage for life-critical claims; processing emergency claims pro rata from available funds; reconstructing accurate

2

account balances (since HMA's records are false); coordinating with healthcare providers; and maintaining digital systems containing claims data.

The Missouri TRO accomplishes none of this. Section 1345 provides custodial authority, not remedial authority. Asset freezes preserve status quo; receiverships provide remedies. *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1365 (S.D. Fla. 2019) ("The Receiver is also necessary to determine the full extent of Defendants' deceptive practices, identify the victims of Defendants' scheme, and prevent further fraudulent practices during the pendency of the preliminary injunction").

### 2. Victims Have Already Waited Too Long

HMA switched from functioning debit cards to non-functional ID cards in October 2023—over two years ago. Claims go unpaid for months or forever. Victims continue making contributions because stopping means forfeiting all funds. Criminal restitution could take another 5-10 years. Victims cannot wait. They need insulin today, chemotherapy tomorrow, medications next week.

As Plaintiffs' motion demonstrated, every day without a receiver means: permanent loss of medical claims data; continued unauthorized charges; victims foregoing treatment with irreversible health consequences; and recovery opportunities vanishing. (Pls.' Mem. ISO Receiver at 14-18; Supp. Mem. at 3-7).

## B. $37 MILLION IN VICTIM FUNDS MUST BE TRACED AND RECOVERED

### 1. The Government Proves Over $37 Million Has Vanished

The government's verified complaint—sworn under penalty of perjury by FBI Special Agent Savannah Latta—proves catastrophic missing funds:

| Date | Reported Balances | Actual Balance | Missing Funds |
|---|---|---|---|
| 10/01/2023 | $33,034,560 | $130,609 | $32,903,951 |
| 02/01/2024 | $38,882,626 | $1,401,769 | $37,480,857 |

(Gov't Verified Compl. ¶ 37). By February 2024, **over $37 million had disappeared**. The government alleges "REGINA and ELLIOT used substantial HMA funds for leisure travel, food and entertainment, and rent on a beachfront condominium." (Id. ¶ 40). But this accounts for only a fraction. Where did the rest go?

## 2. Only a Receiver Can Trace and Recover the Missing Millions

The government will not trace the funds. The government's § 1345 action seeks only to freeze remaining assets—not pursue civil recovery. The government offers no plan to identify transferees, trace fraudulent transfers, or recover diverted assets. HMA certainly will not. HMA opposes any investigation into where the $37 million went and any neutral oversight.

Only a receiver with forensic accountants and fraudulent transfer counsel can: trace the missing $37 million through transaction reconstruction; identify transferees who received funds without fair consideration; pursue fraudulent transfer actions under TUFTA; recover personal-use expenditures like the Gorogs' beachfront condo; clawback preferential payments to insiders and brokers; investigate HMA's false accounting; and maximize recovery through coordinated litigation. Every day without a receiver means fraudulent transfer claims move closer to limitations expiration, transferees conceal assets, witnesses' memories fade, and recovery becomes more difficult. As Plaintiffs' motion explained, fraudulent transfer actions are time-sensitive—delay means permanent loss. (Pls.' Mem. ISO Receiver at 19-22).

### 3. Even Partial Recovery Would Vastly Exceed the Passive Freeze

Even if a receiver recovers only 25% of missing funds from the byzantine structure of LLCs and trusts associated with HMA—$9.25 million—that would increase available assets from $1.4 million to over $10 million. Even assuming receiver fees of $2 million, victims would recover over $8 million net—more than five times what the passive freeze provides.

If the receiver recovers 50%, victims receive over $17 million net. As *Janvey v. Alguire*, 647 F.3d 585, 180 (5th Cir. 2010) demonstrated, receivers maximize recovery for defrauded investors from undercapitalized ventures such as this. The Court can appoint a Receiver despite the insolvency. *Fed. Sec. Rep. (CCH) ¶ 93,424 v. American Bd. of Trade, Inc., 830 F.2d 431 (2d Cir. 1987)* affirmed the district court's decision to install an equity receiver over the American Board of Trade entities notwithstanding the court-found "gross insolvency" of the enterprise. Here, the alternative is permanent loss of $37 million in recoverable assets while we wait years for a judgment in Missouri!

### 4. The Largest Cost Is Losing $37 Million Permanently

Both opponents argue receiver costs are excessive. This ignores that the largest cost is inaction: permanent loss of $37 million as statutes expire, transferees conceal assets, and trails go cold. When properly accounting for this massive cost, receivership benefits overwhelmingly exceed burdens.

### C. HMA BELIEVES IT CAN DEFEAT THE CHARGES AND RESUME OPERATIONS—PROVING THE NECESSITY OF A NEUTRAL RECEIVER

#### 1. HMA Signals Its Intent to Contest Charges and Resume Operations

HMA's response reveals something extraordinary: HMA believes it can beat federal wire fraud charges. HMA argues "all HMAS assets and operations are frozen" and complains about being unable to defend itself (HMA Resp. at 10-12), but simultaneously suggests it might resume

5

operations and contests the government's characterization (id. at 20-21). Most tellingly, HMA argues the receiver would "drain assets" (id. at 20-21)—revealing HMA's expectation that assets will remain after the criminal case. HMA would not make this argument if it believed conviction and forfeiture were inevitable. HMA clearly believes it can defeat or reduce the charges and resume operation of its Ponzi Scheme.

### 2. HMA's Expectation of Beating the Government Is Precisely Why a Receiver Is Necessary

HMA's belief that it can defeat federal charges—despite Elliott Gorog calling it "my Ponzi scheme," despite $37 million missing, despite systematic lies—demonstrates exactly why a neutral receiver is essential. A company that: misappropriated $37 million; reported balances 25-40 times higher than actual funds; used victim money for beachfront condos; systematically lied about sending checks; changed its payment system to conceal fraud; laughed about victims demanding payment; called itself a Ponzi scheme and scam; trapped victims in the "stickiest product known to man"—cannot be trusted with any operational authority, regardless of whether it beats criminal charges.

### 3. Criminal Acquittal Would Not Vindicate HMA

The criminal case requires proof beyond reasonable doubt. If HMA successfully defends—through acquittal, hung jury, dismissal, or favorable plea—that would not prove innocence or fitness to manage assets. It would prove only that the government could not satisfy the heightened criminal standard. The receivership standard is much lower: necessity, imminent danger, inadequacy of alternatives. Even if HMA beats criminal charges, these facts establish overwhelming justification for receivership under civil standards.

6

### 4. A Receiver Protects Victims Regardless of Criminal Outcomes

Both opponents tie victim relief to criminal proceedings. The government says: wait for criminal resolution, then maybe restitution. HMA says: the criminal case prejudices our defense, so no receiver. Both positions leave victims with no relief if: HMA successfully defends; the case results in hung jury; the government accepts a plea with minimal restitution; criminal restitution takes 5-10 years; or the government prioritizes penalties over victim compensation.

A receiver eliminates these dependencies. The receiver pursues civil recovery regardless of criminal outcomes. As Plaintiffs' motion explained, Petters demonstrates how criminal prosecution, civil receivership, and bankruptcy can operate simultaneously. (Pls.' Mem. ISO Receiver at 23-26). The receiver recovered over $1 billion—impossible through criminal proceedings alone.

### 5. The Government Cannot Protect Victims If HMA Prevails Criminally

If HMA successfully defends or negotiates favorable resolution, the government's § 1345 freeze dissolves. Assets return to HMA's control. HMA could resume operations, drain remaining funds, complete destruction of evidence, and leave victims with nothing. **The government offers no contingency plan**. Only a receiver appointed now, independent of criminal proceedings, can protect victims regardless of criminal outcomes.

### D. HMA'S LEGAL ARGUMENTS REST ON INAPPOSITE CASES

### 1. The "First-in-Time" Cases Do Not Apply—Missouri Never Took Custody

HMA's jurisdictional argument (HMA Resp. at 7-11) cites authorities dealing with dueling in-rem proceedings where one court had already seized property. HMA's lead cases—*Harkin v. Brundage, Bryan v. Speakman, Jacobs v. DeShetler, Carter Oil Co. v. McQuigg*—all involved two courts asserting concurrent control after one had instituted in-rem proceedings and seized property

7

**through a receiver.** The Fifth Circuit in *Bryan* barred interference with property already before a state court that had "reached out for and taken hold of the property" via foreclosure. *Bryan v. Speakman*, 53 F.2d 463 (5th Cir. 1931). No such possession exists here. Missouri entered only a prohibitory TRO restraining HMA's conduct—it never appointed a receiver, never sequestered assets, never asserted dominion. A prohibitory injunction that merely freezes defendant's assets does not create a res in the issuing court's custody. The government could seek to achieve this sort of dominion in its Missouri case but chose not to.

Because "there is no constructive possession of the property" in Missouri, the first-in-time rule is not triggered. *The Rev. Andrew P. Jacobs v. Kenneth Deshetler, Superintendent of Insurance of the State of Ohio,* 465 F.2d 840 (6th Cir. 1972).(priority applies only when first court "must have control of the property"). The absence of any Missouri receivership leaves this Court free to appoint a receiver here in Houston where the property exists without offending comity.

2. **Receivers Are Officers of This Court, Not Agents of HMA**

A receiver is "acting as an officer of the court and has the duty to preserve and protect the property pending the outcome of the litigation. ... [T]he receiver's authority is wholly determined by the order of the appointing court." *Citibank v. Nyland (CF8) Ltd*., 839 F.2d 93, 98 (2d Cir. 1988). Rule 65(d) binds parties, their agents, or those in concert, but "receivers are not bound by contracts of the entity that they are appointed to protect" and are not deemed agents of defendants. *Id.*

HMA's post-appointment cases—*SEC v. Stanford Int'l Bank and Liberte Capital Group v. Capwill (*HMA Resp. at 8-10)—accept the receiver's existence and police the outer boundary of equitable relief. They nowhere suggest courts lack power to appoint receivers where the res remains under defendant's control and lesser measures have proved inadequate. Stanford reaffirms

8

"the district court has broad discretion to shape equitable remedies necessary to protect the estate." 927 F.3d 830, 841 (5th Cir. 2019).

*SEC v. Wencke* upheld a litigation stay precisely because the court had already "taken control over the properties" by appointing a receiver. 622 F.2d 1363 (9th Cir. 1980). HMA converts post-appointment cautions into a pre-appointment bar—a leap the cases do not support.

### 3. The "Extraordinary Remedy" Cases Underscore Rather Than Defeat Receivership

HMA invokes *Netsphere*'s formulation that receivership is "extraordinary." (HMA Resp. at 12-13). Yet Netsphere supplies the controlling test: appointment when (1) "clear necessity" exists, (2) "legal and less drastic remedies are inadequate," and (3) "benefits outweigh burdens." 703 F.3d 296, 305 (5th Cir. 2012).

The Fifth Circuit applied this to affirm receivership even where asset freezes and contempt sanctions existed because those measures were insufficient. *SEC v. Timothy Barton*, No. 24-10004 (5th Cir. Apr. 17, 2025) ("a receivership is the only appropriate remedy because no other remedy insulates the investor assets from Barton while also allowing for a litigation stay and active management.").

Plaintiffs presented unrebutted evidence that: HMA controls $37 million in missing funds that must be traced; the Missouri TRO has not stopped dissipation or provided victim relief; and only a neutral fiduciary can trace, marshal, and safeguard accounts while pursuing fraudulent transfer recoveries. That record satisfies Netsphere.

HMA's reliance on *Vederra Holdings LLC v. Global Equity Partners, LLC*, 2024 WL 3798220 (S.D. Tex. July 15, 2024), is misplaced. That court refused relief because the movant offered only "conclusory assertions". Defendants text message admission and government-verified proof of $37 million missing, and documentary evidence present the antithesis of Vederra's bare allegations.

9

### 4. Modern Precedent Confirms Receivership Is Essential Where TROs Cannot Stop Dissipation

Recent Fifth Circuit decisions repeatedly appoint receivers notwithstanding parallel injunctions when continued defendant control threatens recovery. *Barton* found "an asset freeze alone is inadequate" because property "requires active management." *SEC v. Timothy Barton*, No. 24-10004 (5th Cir. Apr. 17, 2025). That reasoning applies with greater force here: HMA's accounts demand administration, allocations must be reconciled, $37 million in fraudulent transfers must be traced, and forensic accounting cannot be performed while principals remain in control.

Federal courts confronted with overlapping receiverships routinely coordinate through comity, information-sharing, and tailored carve-outs. *SEC v. Wencke*, 622 F.2d 1363, 1374-75 (9th Cir. 1980) (directing district court to re-evaluate scope, not vacate receivership). That cooperative model demonstrates potential overlap is a case-management issue, not a jurisdictional bar.

### 5. Federal Courts Appoint Receivers Before Judgment

Both opponents argue receivership requires judgment (Gov't Br. at 15-17; HMA Resp. at 15-16). This contradicts binding authority. Federal courts have long recognized that a pre-judgment receiver may be essential when fraud places assets in peril. *See, e.g., SEC v. Wencke*, 622 F.2d 1368, 1370-71 (9th Cir. 1980) (affirming appointment of a receiver "to take custody of and conserve whatever assets might remain" so they could be marshaled for defrauded investors); *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551-52 (6th Cir. 2006) (appointment proper "when necessary to preserve the property pending final disposition"); *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (upholding Stanford receivership because, absent a receiver, "assets will be dissipated before final judgment").

Rule 66 requires only "an interest in certain property"—not a judgment. (Pls.' Mem. ISO Receiver at 8-11). If ca receiver is not appointed until judgment, the $37 million will likely never

10

be recovered. By then, transferees will have concealed assets, statutes will have run, and trails will be cold.

### 6. Proof of Fraud Is Not Required

HMA argues fraud must be proven (HMA Resp. at 18-19). This is foreclosed. The Eighth Circuit: "Proof of fraud is not required to support a district court's discretionary decision to appoint a receiver." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993).

The Ninth Circuit explained that appointment of a receiver is justified only in "extraordinary" circumstances and turns chiefly on whether the property is "in imminent danger of being lost, concealed, injured, diminished in value, or squandered" and whether "legal remedies are inadequate," with fraudulent conduct merely one of several non-dispositive considerations. *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837 (9th Cir. 2009). *Netsphere* confirms: "Receiverships also have been upheld in derivative actions by stockholders against corporations to prevent the threatened diversion of assets through fraud or mismanagement. E.g., Tanzer v. Huffines , 408 F.2d 42, 43 (3d Cir. 1969)", *Netsphere, Inc. v. Baron*, 703 F.3d 296 (5th Cir. 2012.). The disjunctive "or" proves fraud is not required in this Circuit.

Even if fraud were required—which it is not—the government's verified complaint proves Elliott Gorog confessed to "my Ponzi scheme" and $37 million vanished. (Gov't Verified Compl. ¶¶ 37, 42).

### 7. Plaintiffs Satisfy All Receivership Factors

"Factors that courts have considered as indicating the need for a receivership include the following: "a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic

11

equitable remedy; and likelihood that appointing the receiver will do more good than harm." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316-17 (8th Cir.1993).", *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241-242 (5th Cir. 1997)

**Valid Claims**: Plaintiffs plead breach of contract. This is a legal layup based on the facts presented. The government confirms HMA operated a Ponzi scheme with $37 million missing.

**Fraud Risk**: Elliott Gorog confessed to "my Ponzi scheme." Fraud is admitted and proven.

**Imminent Danger**: Every day means: (a) permanent loss of $37 million as transferees conceal assets and limitations run; (b) corruption of claims data; (c) victims foregoing medical treatment; (d) continued unauthorized charges. (Pls.' Mem. ISO Receiver at 14-18; Supp. Mem. at 3-7).

**Inadequacy of Legal Remedies**: A judgment years hence cannot: trace the $37 million; resurrect corrupted data; pursue time-sensitive fraudulent transfers; or provide immediate medical care.

**No Narrower Remedy**: The Missouri TRO cannot trace the $37 million, pursue fraudulent transfers, reconstruct accounts, process claims, or maintain systems. (Pls.' Mem. ISO Receiver at 11-14).

**Benefits Overwhelm Burdens**: Benefits include immediate victim relief and potential recovery of $37 million. Even partial recovery would increase available assets by 500-2000%. (Pls.' Mem. ISO Receiver at 19-23). There is no burden to HMA. It's already ashes after the FBI raid.

### E. THIS COURT HAS AUTHORITY TO COORDINATE WITH MISSOURI AND DIRECT TURNOVER

The proposed order (Pls.' Mem. ISO Receiver, Ex. A) provides comprehensive coordination: vests receiver with exclusive authority; requires conferral with the United States and Judge Ketchmark; authorizes either court to modify orders if conflicts arise; directs preservation of

evidence; requires regular reports; *see* establishes guidance procedure. *See, e.g., Mann Manufacturing, Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir.1971) (court with prior jurisdiction over common subject matter may best resolve all issues presented in related actions)

An asset freeze pursuant to § 1345 does not turn restrained funds into the exclusive res of the issuing court, nor does it bar this Court's equitable powers. District court's power to supervise an equity receivership is extremely broad to determine actions to be taken in the administration of the receivership." *SEC v. Forex Asset Mgmt.*, 242 F.3d 325, 331–32 (5th Cir. 2001). Federal courts have inherent authority to direct government agencies or financial institutions to comply with receivership orders, including modifying or lifting asset freezes for purposes of victim compensation, especially where public interest and equitable concerns so require. *FTC v. Productive Marketing, Inc.*, 136 F. Supp. 2d 1096, 1104–06 (C.D. Cal. 2001). When the government becomes a party, the court's orders bind it, and turnover or transfer to a receiver is routine.

### F. PLAINTIFF IS SEEKING TO RUN A PLAY FROM THE *PETTERS* PLAYBOOK

Federal courts routinely recognize that criminal asset freezes and civil equity receiverships serve complementary functions. The government's § 1345 freeze preserves assets; a civil receivership actively manages them for victims' benefit. Both can—and should—operate simultaneously. The Petters Ponzi scheme litigation provides a paradigm. In *United States v. Petters*, No. 0:08-cv-05348 (D. Minn.), the government obtained a § 1345 freeze identical to the Missouri TRO here. The district court then appointed a civil receiver who operated in parallel with the criminal proceedings. The receiver ultimately recovered more than $1 billion for victims—recovery that would have been impossible with a passive freeze alone.

The Petters court established a "Coordination Agreement" between the DOJ, a private Receiver (just like we are seeking here), and Bankruptcy Trustees for several related entities, under which the criminal process did not involve forfeiture or restitution, while the receivership process managed liquidation and distribution. (Agreement attached here as Exhibit "A"") This coordinated approach maximized victim recovery while preserving the government's criminal case—exactly what should happen here. While all the specifics off Petters won't work in this much smaller case it's the same basic play. This nothing novel about what Plaintiff is trying to do. Plaintiffs are running a play out of the Ponzi Collection Playbook. This play in Ponzi is as common as running I-Form Off Tackle.

Neither the government nor HMA offers any explanation for why the Petters approach would not work in this case. The government's silence on Petters is particularly conspicuous since it helped install this play in the victims offense ten years ago. The government wants this Court to believe that its passive freeze is sufficient, but the *Petters* case (about $1b recovered for victims) proves the play works and needs to be executed here now.

HMA's silence on coordination models like *Petters* is equally telling. HMA wants this Court to believe coordination is impossible, but multiple successful precedents prove otherwise. HMA simply prefers chaos to court-supervised accountability.

Neither opponent offers specific objections to these provisions. Both simply oppose any receiver—proof their concern is control, not coordination.

## CONCLUSION

Victims need help now. They need access to medical care today. They need the $37 million traced and recovered. They need protection from a confessed Ponzi operator who believes it can beat federal charges and resume operations. Neither opponent offers any solution. The government

14

obtained a minimal freeze providing no victim relief and will not pursue recovery. HMA opposes any investigation into where money went. Both ask this Court to let $37 million remain permanently lost while victims receive nothing.

The emergency is real. The harm is immediate. HMA suffers no possible prejudice since it is dead in the water. There is $37 million waiting to be recovered. Only a neutral receiver can protect victims, trace stolen funds, prevent HMA from perpetuating fraud, and coordinate with—but not defer to—criminal proceedings. This Court should appoint the proposed receiver immediately with full authority to:

- **Trace and recover the $37 million** through forensic accounting and fraudulent transfer litigation;
- **Apply frozen assets to collection efforts;**
- **Process emergency medical claims** and provide immediate victim relief;
- **Pursue fraudulent transfer actions** against the Gorogs and other transferees;
- **Stabilize digital infrastructure** and preserve electronic records;
- **Reconstruct accurate account balances** using proper accounting;
- **Coordinate with prosecutors** while independently pursuing civil recovery;
- **Design and implement equitable distribution** to all victims.

Victims have waited two years since HMA destroyed their access to healthcare funds. They cannot wait another 5-10 years for criminal restitution that may never come—especially when HMA believes it can beat the charges. This Court should appoint the proposed receiver immediately.

WHEREFORE, Plaintiffs respectfully request that the Court swiftly enter the attached order appointing Nick Foley as Receiver.

Dated: November 4, 2025     Respectfully submitted,

.

*Alexander Loftus* (signature)

ALEXANDER LOFTUS, Esq.
Attorney-in-Charge
SDTX Federal No. 3663102
**LOFTUS & EISENBERG, LTD.**
181 W Madison, Suite 4700
Chicago, Illinois 60602
Ph: 312.899.6625
alex@loftusandeisenberg.com

- *and* -

JAMES CREWSE, Esq.
Texas Bar No. 24045722
**CREWSE LAW FIRM, PLLC**
5919 Vanderbilt Ave.
Dallas, Texas 75206
Ph: 214.394.2856
jcrewse@crewselawfirm.com

**ATTORNEYS FOR PLAINTIFFS
AND THE PROPOSED CLASSES**

## CERTIFICATE OF SERVICE

    I certify that a true and correct copy of this Reply has been served on all counsel of record through the Court's CM/ECF system on November 3, 2025.

*Alexander Loftus*